**In re ROYAL DUTCH/SHELL TRANSPORT SECURITIES LITIGATION.**

Civil Action No. 04–374(JWB).

United States District Court, D. New Jersey.

Aug. 9, 2005.

Bernstein, Liebhard & Lifshitz, by Stanley D. Bernstein, Esquire, Keith M. Fleischman, Esquire, Jeffrey M. Haber, Esquire, U. Seth Ottensoser, Esquire,

Mark T. Millkey, Esquire, New York, NY, Lead Counsel for Lead Plaintiff and the Class—Colbert Birnet, L.P.; Pennsylvania State Employees' Retirement System; and Pennsylvania Public School Employees' Retirement System.

Lynch, Martin, Kane, Kuper, Keefe & Bartels, by John E. Keefe, Jr., Esquire, Shrewsbury, NJ, Liaison Counsel for the Class.

Robertson, Freilich, Bruno & Cohen, by William W. Robertson, Esquire, Jeffrey A. Cohen, Esquire, Newark, NJ, and Debevoise & Plimpton, by Colby Smith, Esquire, Washington, DC, for Defendants Royal Dutch Petroleum Company; N.V. Koninklijke Nederlandsche Petroleum Maatschappij; The "Shell" Transport and Trading Company, PLC; Shell Petroleum, N.V.; and The Shell Petroleum Company Limited.

Akin Gump Strauss Hauer & Feld, by James Osborne, Esquire, Washington, DC, for Defendant Van der Vijver.

Robinson & Livelli, by Donald A. Robinson, Esquire, Newark, NJ, Shearman & Sterling, LLP, by Steven F. Molo, Hayden S. Baker, New York City, NY, for Defendant KPMG NV.

Bressler, Amery & Ross, by Thomas A. McKinney, Esquire, Morristown, NJ, for Defendant KPMG, Int'l.

Lowenstein Sandler, by Douglas S. Eakeley, Esquire, Marcela A. DePaulis, Esquire, Roseland, NJ, Heller Ehrman, LLP, by Lawrence Zweifach, Richard Cashman, New York City, NY, for Defendant PWC Int'l.

Hughes Hubbard & Reid, by John N. Poulos, Esquire, Jersey City, NJ, and Hughes Hubbard & Reid, by William R. Maguire, Esquire, Savvas A. Foukas, Esquire, New York, NY, for Defendant PWC UK.

## OPINION

BISSELL, Chief Judge.

## TABLE OF CONTENTS

**Facts and Background** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 515
 Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 515
 Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 518
 Structure of the Companies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 524
 Group Management . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 525
 Oil & Gas Reserves . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 526
 Overbooking of Proved Reserves . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 527
 Defendants' Alleged Knowledge of the Group's Overbookings . . . . . . . . . . . . . . . . . . 530
 Geographic Areas . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 534
 Proffered False and Misleading Statements and Omissions . . . . . . . . . . . . . . . . . . . . 536
 Truth about Reported Reserves . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 536
 SEC Investigation and other Regulatory Actions . . . . . . . . . . . . . . . . . . . . . . . . . . . 537
 Claims for Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 538

**Discussion** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 539
 I. Rule 12(b)(1) Motion to Dismiss for Lack of Subject Matter Jurisdiction . . . . . 539
 Standard of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 539
 Application . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 539
 Conduct in the U.S . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 540
 Shell Deepwater Services . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 542
 Audits at SDS in Houston . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 544
 Investor Relations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 544
 Alleged Inconsistent Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 545
 Res Judicata . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 546

 International Comity .............................................548
 II. Defendant Watts' Rule 12(b)(2) Motion to Dismiss...........................548
 Standard of Law ..............................................548
 General Jurisdiction ...........................................549
 Specific Jurisdiction ...........................................549
 Exercise of Specific Personal Jurisdiction..........................550
 III. RDS Defendants' Rule 12(b)(6) Motions to Dismiss .......................551
 Standard of Law ..............................................552
 Section 10(b), 15 U.S.C. § 78j(b).................................553
 10(b) Claims against RDS .....................................554
 10(b) Claims against Individual Defendants ........................557
 Section 14(a) Claims .........................................564
 Section 20(a) Claims .........................................564
 IV. Auditor Defendants' Rule 12(b)(6) Motions to Dismiss .....................565
 Statute of Limitations.........................................565
 KPMG NV & PwC UK Motions .................................566
 KPMG Int'l & PwC Int'l Motions ..............................570

**Conclusion**...................................................................572

This matter comes before the Court on various motions to dismiss, pursuant to Federal Rules of Procedure 12(b)(1), 12(b)(2) and 12(b)(6), by the Individual and Corporate Defendants of Royal Dutch/Shell Transport and Defendants KPMG NV, KPMG International, PwC UK and PwC International. On July 13 and July 15, 2005, this Court heard oral arguments on the aforesaid motions.[1] This court has jurisdiction over this matter pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

### FACTS & BACKGROUND

#### Overview

Lead Plaintiff, the Pennsylvania State Employees' Retirement System and the Pennsylvania Public School Employees' Retirement System ("Lead Plaintiff"), brings this action on behalf of itself and all persons who purchased the securities of N.V. Koninklijke Nederlandsche Petroleum Maatschappij, a/k/a the Royal Dutch Petroleum Company, ("Royal Dutch") and The Shell Transport and Trading Compa-

ny, PLC ("Shell Transport") (together, Royal Dutch and Shell Transport will be referred to as either "RDS", "The Shell Group" or the "Companies"), including the ordinary shares traded on overseas markets and the New York Stock Exchange ("NYSE") and the American Depository Receipts ("ADRs") trading on the NYSE between April 8, 1999 and March 18, 2004 (the "Class Period"). The Defendants include: RDS, several of RDS's current and former senior executives, and RDS's outside auditors, PricewaterhouseCoopers LLP ("PwC UK") and KPMG Accountants N.V. ("KPMG NV"), as well as PricewaterhouseCoopers International and KPMG International. The Complaint seeks to recover damages caused by alleged violations of the federal securities laws.

The claims in the Complaint stem from the dissemination by RDS of what Plaintiff characterizes as "materially false and misleading statements" concerning RDS's reported proved oil and natural gas reserves. *See* Consolidated Amended Class Action Complaint ("Complaint"), ¶ 3. The Complaint alleges that, during the Class Peri-

---

1. The Court did not hear oral argument on Defendant Watts' motion to dismiss pursuant to Rule 12(b)(2), and upon the motions to dismiss Counts IV and V of the Consolidated Amended Class Action Complaint. Decisions on those motions, based on the papers, are included in this Opinion.

od, RDS issued false public reports, overstating: (a) their proved oil and natural gas reserves by billions of barrels of oil equivalent ("boe"), (b) their reserves replacement ratio ("RRR"), and (c) their future cash flows by over $100 billion. *Id.* Plaintiff claims that before and during the Class Period, the RDS Defendants repeatedly represented to the investing public that RDS was successfully identifying new proved oil and gas reserves and replacing existing proved reserves depleted by production. New and existing proved reserves are key performance indicators in the oil and gas industry. *Id.* ¶ 4. Such representations were made in proposals to market analysts, press releases, Annual Reports, filings with the United States Securities and Exchange Commission ("SEC") and through other public media. *Id.* RDS's joint reports include Form 20–F, which the SEC requires to be filed annually. The RDS Defendants represented the following on Form 20–F for the years 1998–2002:

### 1998

**Reserves**

During 1998 the Group's total proved reserves for oil (including natural gas liquids) and natural gas increased from 19.4 to 20.5 billion barrels of oil equivalent.... The net additions to proved reserves more than replaced the 1998 production, with replacement ratios of some 140% for oil (compared with 130% in 1997) and some 250% for gas (compared with 210% in 1997).

### 1999

**Reserves**

The overall 1999 replacement ratio of proved crude oil and natural gas reserves and oil sands stands at 101% (147% excluding 1999 divestments and acquisitions).... The three-year rolling average replacement ratio for total crude oil and natural gas proved reserves ... stands at 132%, reflecting the fact that oil and gas production over 1997–99 has been more than replaced by net additions over the same period.

### 2000

**Reserves**

The proved hydrocarbon reserves replacement ratio for 2000 was 105%.... Therefore production during the year of 1.4 billion barrels of oil equivalent was more than replaced.... The three-year rolling average proved hydrocarbon reserves replacement ratio ... stands at 117%.

### 2001

**Reserves**

The proved hydrocarbon reserves replacement ratio for 2001 is 74% ... [A]nd the three-year rolling average ... now stands at 101%. Proved reserves are equivalent to more than 14 years of current production.

### 2002

**Reserves**

The proved hydrocarbon reserves replacement ratio for 2002 was 117% and the five year rolling average ... now stands at 109%.... Proved reserves are equivalent to more than 13 years of current production.

*Id.* ¶ 4.

Furthermore, the Complaint alleges that PwC UK and KPMG NV, individually and jointly, issued materially false, misleading and unqualified audit opinions that were included in the Class Period financial statements filed with the SEC by RDS. *Id.* ¶ 5. In the reports, PwC UK and KPMG NV purportedly misrepresented that each had conducted their respective audits "in accordance with U.S. generally accepted auditing standards ("GAAS")." *Id.* Furthermore, it is alleged that they falsely represented that the audited financial statements presented fairly both the financial position of the Shell Group, Shell

Transport and Royal Dutch as of December 31, 1998–2002 and the results of operations and cash flows for each of those years, in accordance with generally accepted accounting principles ("GAAP"), in the Netherlands and the United States. *Id.*

On January 9, 2004, before the markets opened in Europe, RDS released a disclosure entitled "Proved Reserve Recategorisation," which announced that in order to comply with SEC regulations, it would be reducing previously reported proved reserves by 20%, or approximately 3.9 billion boe. *Id.* ¶ 6. After that disclosure, the trading price of the ordinary shares of both Shell Transport and Royal Dutch and the ADRs of Shell Transport declined. *Id.* As a result of the disclosure, it is alleged that RDS lost $13.84 billion of market value. *Id.* After the initial announcement on January 9, 2004, RDS has further reduced its estimated proved oil and natural gas reserves three additional times—on March 18, April 19 and May 24, 2004—for a total reclassification of 4.47 billion boe, or 23%. *Id.* ¶ 8.

Since the reclassification, four civil investigations by regulatory authorities in the United States and Europe have been commenced and the United States Department of Justice has initiated a criminal investigation. *Id.* ¶ 11. In a January 12, 2004 article in The Wall Street Journal, former SEC chief accountant Lynn Turner was quoted as follows: "A 20% restatement of proven reserves is a humongous error. For a company like Shell to have missed its proven reserves by that much is not an oversight. It's an intentional misapplication of the SEC's rules." *Id.* ¶ 11. (quoting The Wall Street Journal, "Shell Cuts Reserve Estimate 20% as SEC Scrutinizes Oil Industry," January 12, 2004). The Complaint alleges that on February 3, 2004, RDS's Group Audit Committee (the "GAC") retained Davis Polk & Wardwell ("Davis Polk") to lead a limited internal review into the circumstances resulting in the overbooking of reserves. *Id.* ¶ 12. On April 19, 2004, RDS released the executive summary of the March 31, 2004 Report of Davis Polk to the GAC (the "GAC Report") in which Davis Polk concluded that Shell Transport had been overbooking reserves as early as 1997, during Defendant Philip Watts' and Defendant Walter van de Vijver's respective tenures as head of RDS's Exploration and Production ("EP") unit. *Id.* ¶ 13.

The GAC report stated that the aforementioned executives "were alert to the difference between the information concerning reserves that had been transmitted to the public ... and the information known to some members of management." *Id.* ¶ 13. The GAC report further stated that "EP managements' plan was to 'manage' the totality of the reserve position over time, in hopes that problematic reserve bookings could be rendered immaterial by project maturation, license extensions, exploration successes and/or strategic activity;" however, Defendants' "strategy 'to play for time' in the hope that intervening helpful developments would justify, or mitigate, the existing reserve exposures ... failed as business conditions either deteriorated or failed to improve sufficiently to justify historic bookings." *Id.* ¶ 14. The Complaint alleges that the GAC Report was accepted in full by the GAC on April 15, 2004, and by the members of the Supervisory Board of Royal Dutch and the non-executive Directors of Shell Transport on April 16, 2004. *Id.* ¶ 15.

The Complaint further alleges that RDS's acceptance of responsibility for the alleged conduct was also set forth in the Annual Reports disseminated by Shell Transport and Royal Dutch shortly before the Amended Complaint was filed. *Id.*

¶ 16. The following is an excerpt of one cited report:

> In connection with the restatement of proved reserves volumes described elsewhere in this report, Royal Dutch and Shell Transport have determined, based largely upon the investigation and report to the GAC, that there were deficiencies and material weaknesses in the internal controls relating to proved reserves bookings and disclosure controls that allowed volumes of oil and gas to be improperly booked and maintained as proved reserves. The inappropriate booking of certain proved reserves had an effect on the Financial Statements, mainly understating depreciation, depletion and amortisation.

*Id.* ¶ 16.

The GAC Report also described that the overbooking of oil and natural gas reserves over such a lengthy period of time was possible only "because of certain deficiencies in the Company's controls." Plaintiff alleges that "[u]nder GAAS, PwC UK and KPMG NV were required to review and understand RDS's internal control structure and determine whether reliance thereon was justified, and if such controls were not reliable, to expand the nature and scope of those controls to correct them." *Id.* ¶ 18. Lead Plaintiff concludes that PwC UK and KPMG NV failed to do so. *Id.*

### Parties

Defendant Royal Dutch is headquartered in The Hague, The Netherlands. *See* Compl., ¶ 45. Its common shares are registered with the SEC pursuant to Section 12(b) of the Exchange Act and trade on the New York Stock Exchange ("NYSE"). *Id.* The principal trading markets for Royal Dutch shares are the NYSE and the Euronext Exchange in Amsterdam. Royal Dutch is one of the parent companies in the Shell Group and in conjunction with Shell Transport, owns, directly or indirectly, investments in the numerous companies referred to collectively as the "Group Holding Companies." *Id.*

Defendant Shell Transport is headquartered in London, England. *Id.* ¶ 46. Its ordinary shares, as well as shares of an aggregate nominal amount of £1.50 and evidenced by ADRs, are registered with the SEC pursuant to Section 12(b) of the Exchange Act. *Id.* The primary market for Shell Transport's ordinary shares is the London Stock Exchange. The ADRs trade on the NYSE. *Id.* As the parent companies, Royal Dutch and Shell Transport do not directly engage in operational activities. *Id.* ¶ 47. Each own the shares in the Group Holding Companies and neither is part of the Shell Group. *Id.* Royal Dutch and Shell Transport appoint Directors to the Boards of the Group Holding Companies, from which they receive income in the form of dividends. *Id.* Royal Dutch has a 60% interest in the Group and Shell Transport has a 40% interest.

Defendant Sir Philip Watts is a citizen of the United Kingdom. *Id.* ¶ 48. Watts served as a Director and as a Managing Director of Shell Transport beginning in 1997, as Shell Transport's Chairman and as Chairman of the Committee of Managing Directors ("CMD") beginning in 2001, and as a Group Managing Director beginning in 1997. *Id.* Watts was terminated on March 19, 2004. *Id.* Defendant Watts who joined the Shell Group as a seismologist in 1969 held positions in Asia Pacific and Europe, leading to positions as Exploration Director Shell–U.K. from 1983 to 1985, head of various exploration and production functions in The Hague from 1985 to 1991, Chairman and Managing Director in Nigeria from 1991 to 1994, Regional Coordinator Europe from 1994 to 1995, Director Planning Environment and External Affairs, Shell International from 1996 to 1997, and CEO of the EP unit

from 1997 to 2001. *Id.* Watts signed the Annual Reports on Form 20–F filed with the SEC for 2001–2002 and allegedly falsely certified the 2002 Form 20–F, including the financial statements and reports, of Shell Transport and the Shell Group, pursuant to the Sarbanes–Oxley Act of 2002. The Complaint alleges that despite the Shell Group's poor performance, Watts' salary more than doubled between 1999 and 2002, due in large part to reserve replacement credits on his compensation scorecard. *Id.* It is alleged that in 2003 Watts received a 55% pay raise, increasing his base salary to £1.8 million (approximately $3.2 million). *Id.* Upon termination, Watts allegedly received a severance package that included three months' salary for 2003 (£450,000). *Id.*

Defendant Walter van de Vijver, a citizen of the Netherlands, served as a Director of Royal Dutch, the CEO of the EP unit, a Managing Director of Royal Dutch, a Group Managing Director, and a member of the CMD from 2001 until his termination on March 19, 2004. *Id.* ¶ 49. Defendant van de Vijver joined RDS in 1979 as a petroleum engineer and worked in exploration and production in Qatar, Oman, the United States, the United Kingdom and The Netherlands. *Id.* Van de Vijver signed the 2002 Form 20–F and allegedly reviewed and authorized the filing of the 2001 annual report on Form 20–F. *Id.* Lead Plaintiff alleges that van de Vijver's salary tripled between 2001 and 2002, due in large part to reserve replacement credits on his compensation scorecard. *Id.*

Defendant Malcolm Brinded is a citizen of the United Kingdom. *Id.* ¶ 50. Defendant Brinded has been a Director of Royal Dutch and has served as the CEO of RDS's Gas & Power unit since 2002, CEO of the EP unit since 2004, a member of the Royal Dutch Board of Management and a member of the CMD since 2002, and Vice–Chairman of the CMD in March 2004. *Id.* Brinded joined RDS in 1974 and has held various positions in the Company around the world, including Brunei, The Netherlands, Oman and the United Kingdom. *Id.* Lead Plaintiff alleges that Defendant Brinded reviewed and authorized the filing of the 2002 annual report on Form 20–F. *Id.*

Defendant Jeroen van der Veer is a citizen of The Netherlands. Van der Veer, at all relevant times a Director of the Royal Dutch Board of Management, has served as a Group Managing Director since 1997. *Id.* ¶ 51. Van der Veer has served as President of Royal Dutch since 2000 and was promoted to Chairman of the CMD in March 2004. *Id.* He joined RDS in 1971 and held a number of senior management positions around the world. Van der Veer served as the Vice–Chairman of the CMD from 1997–2003 and signed the allegedly false and misleading Annual Reports on Form 20–F under the Sarbanes–Oxley Act.[2] It is also alleged that he reviewed and authorized the filing of the 1998 and 1999 Annual Reports on Form 20–F. *Id.*

Defendant Judith Boynton is a citizen of the United States. Boynton served as RDS's Chief Financial Officer ("CFO") beginning in 2001 and as a Shell Transport Director and a Group Managing Director beginning in 2003. *Id.* ¶ 52. Defendant Boynton served as a member of the CMD from 2003 until her removal from all her executive and directorial positions on April 19, 2004. *Id.* Boynton's responsibilities in-

---

**2.** Defendants contend that the Complaint incorrectly alleges that van der Veer was CMD Vice Chairman beginning in 1997. Rather, Defendants submit that van der Veer held this position from July 2000 until March 2004, when he became CMD Chairman. *See* RDS Br. in Support of 12(b)(6) Motion to Dismiss, at 8.

cluded preparing RDS's financial statements which were filed with the SEC and disseminated to the investing public and shareholders of RDS. *Id.* Defendant Boynton was also responsible for overseeing RDS's internal disclosure and financial controls to ensure that they were adequate and complied with the federal securities laws. *Id.* Lead Plaintiff alleges that Defendant Boynton falsely certified RDS's annual report on Form 20–F for the year 2002 pursuant to the Sarbanes–Oxley Act. *Id.*

Defendant Paul Skinner is a citizen of the United Kingdom. *Id.* ¶ 53. He served as a Director and as a Managing Director of Shell Transport beginning in 2000, as chief executive officer of Shell Oil Products beginning in 1999, and as a Group Managing Director and a member of the CMD beginning on January 1, 2000, until his retirement in September 2003. Defendant Skinner allegedly reviewed and authorized the filing of RDS's 2000 through 2002 Annual Reports on Form 20–F. *Id.*

Defendant Maarten van den Bergh is a citizen of The Netherlands. *Id.* ¶ 54. He has served as a Director of Royal Dutch since 2000, a Managing Director of Royal Dutch from 1992 to 2000, and as President of Royal Dutch from 1998 to 2000. *Id.* From 1998 to 2000, van den Bergh served as Vice Chairman of the CMD. Defendant van den Bergh allegedly reviewed and authorized the filing of RDS's Annual Reports on Form 20–F for the years 2000 through 2002. *Id.*

Defendant Mark Moody–Stuart is a citizen of the United Kingdom. Id. ¶ 55. He has served as a Director of Shell Transport and as the Chairman of Shell Transport from 1997 to 2001. *Id.* From 1991 through July 2001, he served as a Group Managing Director and member of the CMD. It is alleged that Defendant Moody–Stuart reviewed and authorized the filing of RDS's Annual Reports on Form 20–F for the years 2000 through 2002. *Id.*

Defendant Aad Jacobs is a citizen of The Netherlands. *Id.* ¶ 56. Throughout the Class Period, Jacobs served as a Director of Royal Dutch, and since 2002 as Chairman of the Royal Dutch Supervisory Board and Chairman of the GAC. *Id.* It is alleged that Defendant Jacobs reviewed and authorized the filing of RDS's Annual Reports on Form 20–F for the years 2000 through 2002. *Id.*

Defendant Harry Roels is also a citizen of The Netherlands. *Id.* ¶ 57. Defendant Roels served as a Managing Director at Royal Dutch and a member of the Board of Management of RDS beginning in July 1999. *Id.* He joined RDS in 1971 as a petroleum engineer, working in exploration and production in Malaysia, Brunei, the United Kingdom, Turkey, Norway and The Netherlands. *Id.* Defendant Roels relinquished his positions with RDS in June 2002. It is alleged that Defendant Roels reviewed and authorized the filing of RDS's Annual Reports on Form 20–F for the years 1999 through 2002. *Id.*

Defendant Steven L. Miller is a citizen of the United States. *Id.* ¶ 58. Defendant Miller served as a Group Managing Director beginning in 1996 and as a Director of Shell Transport's Board of Directors beginning in 1998.[3] He also served as the Chairman, President and Chief Executive Officer of Shell Oil Company. *Id.* During Defendant Miller's tenure, he worked with the CMD in the formation of RDS's strate-

---

**3.** Defendants submit that Mr. Miller was never a Shell Transport director, but rather served as the Managing Director of Royal Dutch from July 1996 through July 1, 1999. On July 1, 1999, Miller became CEO and Chairman of Shell Oil Company, a U.S. company within the Group. Defendants allege that Miller left the Group in 2001. *See* RDS Br. in Support of 12(b)(6) Motion to Dismiss, at 6.

gy and in the development and deployment of RDS's senior executives. *Id.* It is alleged that Defendant Miller reviewed and authorized the filing of RDS's Annual Reports on Form 20–F for the year 2001. *Id.*

Lead Plaintiff alleges that the Individual Defendants (Watts, van de Vijver, Brinded, van der Veer, Boynton, Skinner, van den Bergh, Moody–Stuart, Jacobs, Roels and Miller), as officers and/or directors of Royal Dutch or Shell Transport, were privy to confidential and proprietary information concerning RDS, its operations, reported reserves and business prospects. *Id.* ¶ 73. Furthermore, Plaintiff proffers that the Individual Defendants "had access to internal documents, reports, and other information, including, among other things, the material, adverse, non-public, information concerning the Companies' and the Shell Group's classification of proved oil and gas reserves." *Id.* As a result, Plaintiff alleges, the Individual Defendants were responsible for the truthfulness and accuracy of the Shell Group's and the Companies' public statements. *Id.* Plaintiff also characterizes the Individual Defendants as "controlling persons" of the Companies within the meaning of Section 20 of the Exchange Act. *Id.* ¶ 74. The Complaint alleges that "[b]y reason of their positions with Royal Dutch and Shell Transport, they were able to and did, directly or indirectly, in whole or in material part, control the content of public statements issued by or on behalf of the Shell Group, including statements to securities analysts and financial reporters." *Id.* Accordingly, Plaintiff contends that the Individual Defendants are liable for the allegedly false statements, because the statements were "group-published" information, the result of the collective action of the Individual Defendants. *Id.*

Plaintiff alleges that PwC and KPMG provided unqualified Independent Auditors' Reports for the Shell Group's annual reports for the years ended 1998 through 2002. Compl., ¶ 515. It is alleged that these "unqualified audit opinions and reports violated GAAS and greatly enhanced and facilitated the fraud.…" *Id.* Defendant PwC International, a membership-based company organized in the United Kingdom with its U.S. headquarters in New York, New York, is a professional services organization with member firms around the world. *Id.* ¶ 60. PwC International provides industry-focused assurance, tax and advisory services for public and private clients primarily in four areas: corporate accountability, risk management, structuring and mergers and acquisitions, and performance and process improvement. *Id.* The Complaint alleges that PwC International represents itself as a "truly global organization" that "build[s] networks of highly skilled professionals around clients and provide[s] them with the benefit of PwC's collective knowledge and resources." *Id.* ¶ 62. The PwC International website states that "[o]n joining the PwC global network and becoming members of PwC International, member firms have the right to use the PwC name and to gain access to common resources, methodologies, knowledge and expertise. In return, they are bound to abide by certain common policies and to maintain the standards of the global network as formulated by the CEO of PricewaterhouseCoopers International Limited and approved by its Global Board." *Id.* ¶ 62.

Defendant PwC UK is a limited liability partnership registered in the United Kingdom. *Id.* ¶ 63. PwC, a member of the PwC global network, audits almost one-half of the FTSE 100, the 100 largest companies in the United Kingdom. *Id.* PwC UK provides industry-focused assurance, tax and advisory services for public and private clients and for companies requiring an audit for statutory or regulatory reasons connected with the filing of

their annual and periodic financial information; PwC UK provides an assurance service to shareholders and management on the truth and fairness of the information, and specifically addresses any other regulatory reporting requirements, such as those under the Sarbanes–Oxley Act of 2002. *Id.* With the exception of the descriptions given above, the Complaint refers to PwC International and Pwc UK collectively as "PwC."

PwC was hired by the Shell Group and Shell Transport to provide independent auditing and/or consulting services, including the preparation, examination and/or review of Shell Transport's and the Shell Group's consolidated financial statements for the years 1998 through 2002, which were then disseminated to investors in the United States. *Id.* ¶ 65. The financial statements were presented to, reviewed and relied upon by securities purchasers, governmental agencies, the investing public and members of the financial community. *Id.* The Complaint alleges that by virtue of its position, PwC, at all relevant times, had access to RDS's key personnel, accounting books and records, and documents concerning proved reserves. *Id.* PwC personnel, who were frequently present at the Companies' respective corporate headquarters and major offices throughout the Class Period, had access to the confidential corporate financial and business information, including Shell and Royal Dutch's true financial condition, financial statements and reserve reporting problems, which Lead Plaintiff alleges PwC was aware of and/or recklessly disregarded. *Id.* Furthermore, it is alleged that PwC had the opportunity both to "observe and review the Companies' and the Shell Group's business and reporting practices, and to test the Company's and the Shell Group's internal and publicly reported financial statements, as well as the Shell Group's and the Company's internal controls." *Id.*

PwC was involved in the preparation and dissemination of the Shell Group's and Shell Transport's quarterly and year-end financial results throughout the Class Period. *Id.* ¶ 66. The Complaint further alleges that PwC examined and opined on the Shell Group's and Shell Transport's financial statements for the years 1998 through 2002. *Id.* It is alleged that PwC falsely represented that its audits had been conducted in accordance with GAAS, and wrongfully issued "clean" or unqualified audit reports in which it allegedly misrepresented that those financial statements fairly presented the financial condition and results of operations in conformity with GAAP. *Id.*

Defendant KPMG International is a Swiss cooperative of which it is alleged that all KPMG firms are members. *Id.* ¶ 67. KPMG International has a U.S. headquarters in New York, New York, and provides assurance, tax and legal, and financial advisory services to customers worldwide. It is alleged that like PwC International, KPMG International markets itself as a single global organization. *Id.* Defendant KPMG NV's headquarters is located in Amstelveen, The Netherlands, and it is part of the professional services organization of KPMG International. *Id.* ¶ 68. KPMG NV's core activities in The Netherlands include assurance services, financial advisory services, and tax and legal services. *Id.* The Complaint alleges that KPMG NV's website states that KPMG NV purports to have knowledge of a client's business and organization, such that it can act "as a business partner" of that client. *Id.* With the exception of the above descriptions, the Complaint refers to KPMG International and KPMG NV collectively as "KPMG."

KPMG was hired by the Shell Group and Royal Dutch to provide independent auditing and/or consulting services, includ-

ing the preparation, examination and/or review of Royal Dutch's and the Shell Group's consolidated financial statements for the years 1998 through 2002. *Id.* ¶ 70. Those financial statements were then disseminated to investors in the United States and were presented to, reviewed and relied upon by securities purchasers, governmental agencies, the investing public and members of the financial community. *Id.* KPMG personnel, who were frequently present at the Shell Group's and Royal Dutch's respective corporate headquarters and major offices between 1998 and 2002, had access to confidential corporate financial and business information, including the Shell Group's and Royal Dutch's true financial condition, financial statements and reserve reporting problems, which Lead Plaintiff alleges KPMG was aware of and/or recklessly disregarded. *Id.* Furthermore, it is alleged that KPMG had the opportunity to "observe and review the Royal Dutch's and the Shell Group's business and reserves reporting practices, and to test the Companies' and the Shell Group's internal and publicly reported financial statements, as well as the Shell Group's and the Companies' internal controls." *Id.*

KPMG was involved in the preparation and dissemination of the Shell Group's and Royal Dutch's quarterly, as well as year-end, financial results throughout the Class Period. *Id.* ¶ 72. The Complaint further alleges that KPMG examined and opined on the Shell Group's and Royal Dutch's 1998 through 2002 financial statements. *Id.* It is alleged that KPMG falsely represented that its audits had been conducted in accordance with GAAS, and wrongfully issued "clean" or unqualified audit reports in which it allegedly misrepresented that those financial statements fairly presented the financial condition and results of operations in conformity with GAAP. *Id.*

In addition to providing Independent Auditors' Reports to the Shell Group, the Complaint alleges that both PwC and KPMG also conducted reviews of the Group's quarterly financial statements which were attached as exhibits to Forms 6–K. It is alleged that this review was conducted before the Form was filed with the SEC. Compl., ¶ 516. Citing the GAC Report, the Complaint states that the Shell Group has admitted that the overbooking of the Group's oil and gas reserves was made possible "because of certain deficiencies in the Company's controls." *Id.* ¶ 517. It is alleged that PwC and KPMG, as the Companies' independent auditors, were required to assess the Group's internal disclosure, financial and accounting controls, to determine whether such controls had been placed in operation, were effective and complied with all applicable laws, and to provide assurance about the safeguarding of assets, financial reporting, operations and compliance with regulations. *Id.* Plaintiff submits that part of PwC and KPMG's responsibility was to "evaluate whether poor controls might lead to or contribute to the risk that fraud might not be detected." *Id.*

Throughout the Class Period, PwC and KPMG allegedly received memoranda, conducted meetings and engaged in other communication with senior executives, board members, and the Companies' Group Reserves Auditor ("GRA") about issues such as deficiencies in the Group's internal controls, reporting standards and corporate governance, and how they related to the reserve reclassification. *Id.* ¶ 518. The Complaint refers to two memoranda from GRA Barendregt providing early warning of potentially serious systemic problems with Shell Transport's reserves reporting. *Id.* Despite this, PwC and KPMG issued "false clean audit opinions indicating they had no unresolved doubt about the Shell Group's reserve in-

formation and its compliance with GAAP." *Id.* ¶ 521.

Furthermore, PwC and KPMG are alleged to have consistently represented that each performed its audits in a manner consistent with GAAS. Compl., ¶ 522. Lead Plaintiff submits that such representations were materially false, misleading and without reasonable basis. *Id.* It is alleged that PwC's and KPMG's GAAS violations stem from a "failure to qualify, modify, or abstain from issuing their respective audit opinions on the Shell Group's Class Period financial statements, when each knew or recklessly disregarded [ ] numerous adverse facts and 'red flags' ". *Id.* ¶ 525.

### Structure of the Companies

Royal Dutch and Shell Transport are the parent companies of over 1,700 ventures operating in over 145 countries worldwide. *Id.* ¶ 92. Royal Dutch and Shell Transport share in the aggregate net assets and in the aggregate dividends and interest received from Group companies in proportion to their ownerships (60:40). *Id.* Shell Petroleum N.V. in The Netherlands and The Shell Petroleum Company Limited in the United Kingdom are the two Group Holding Companies. *Id.* ¶ 94. The Group Holding Companies between them hold all of the shares in the Service Companies and, directly or indirectly, all Group interests in the Operating Companies. Prior to the reclassification, the Shell Group Companies claimed to have one of the largest reserves of both liquid and natural gas of the major integrated public oil companies. *Id.* ¶ 98. Most are joint ventures, which the Shell Group companies partner with a wide range of governments and both national and international oil companies. *Id.* The Companies have major oil production in the United States, Nigeria, Oman, the United Kingdom, Syria, Gabon, Brunei, and Malaysia. They also have major gas operations in the United States, The Netherlands, Australia, Brunei, Malaysia and the United Kingdom. Additionally, the Companies have oil production interests in Norway, Abu Dhabi, and Denmark, and gas production interests in Denmark, Norway and Germany. *Id.*

The Shell Group is organized into five main business units:

1. SEPCo, which explores, develops and produces oil and gas in the United States, with principal operations in Texas and the Gulf of Mexico. *Id.* ¶¶ 95–96.

2. Shell Gas & Power, which operates "downstream" to process and transport natural gas, develop power plants, and market gas and electricity to customers around the world, including governments, industrial and commercial businesses, and residential customers. It operates closely with the EP unit, which operates "upstream" in the production of gas reserves. *Id.* 97.[4]

3. Shell Oil Products, which makes a wide range of high quality fuels, lubricants and specialty products, which it sells through its global network of 46,000 retail outlets. *Id.* ¶ 99. The Complaint alleges that it also has an interest in over 50 refineries engaged in the manufacture of a range of crude oil and petroleum products. The Companies within this group include Shell Aviation, Shell LPG, Shell Lubricants and Shell Marine Products. *Id.*

4. Shell Chemicals

---

4. According to the Complaint, the term "upstream," when used in the oil and gas industry refers to the exploration and production of oil and natural gas. This segment of the industry covers the extraction of oil and gas from hydrocarbon bearing reservoirs. "Downstream" operations include the refining, transportation and marketing of petroleum products, including the delivery of these products to retail outlets. *See* Compl., ¶ 97.

5. Shell Renewables & Other Activities
*See* Compl., ¶ 95.

**Group Management**

Shell Transport has a board of directors that is comprised of non-executive directors, at least two Managing Directors of the Company who are also Group Managing Directors, and a Chairman who is also one of the Managing Directors. *Id.* ¶ 101 (quoting Shell Transport Annual Reports) (internal citations omitted). Royal Dutch is managed by a Supervisory Board and Board of Management. *Id.* ¶ 102. The Supervisory Board is appointed by the General Meeting of Shareholders from the persons nominated by the meeting of holders of priority shares. *Id.* The Royal Dutch Board of Management which consists of at least two Managing Directors is under the supervision of the Supervisory Board. *Id.* 103. Managing Directors are appointed by Royal Dutch shareholders and by the Supervisory Board; the Managing Director appointed by the Supervisory Board serves as President of the Board of Management. *Id.* ¶ 103. The responsibilities of the Supervisory Board include supervising the policies of the Board of Management and the general course of business of Royal Dutch and the Shell Group, and advising the Board of Management. *Id.* ¶ 104.

The Boards of both Royal Dutch and Shell Transport delegate management of the Shell Group to the Committee of Managing Directors, a committee comprised of senior executives from each of the two public companies. *Id.* ¶ 105. The members of the CMD are identified as Group Managing Directors. *Id.* The CMD, which has no formal executive authority, is tasked with considering and developing the Shell Group's business plans and objectives. *Id.*

In 2002, the members of the CMD were as follows:

1. Defendant Watts—Chairman of the CMD (2001–2004);

2. Defendant van der Veer (now Chief Executive of Shell)—Vice–Chairman of the CMD;

3. Defendant Skinner (resigned from Shell in 2003);

4. Defendant van de Vijver—responsible for exploration and production, contracting and procurement;

5. Defendant Roels (resigned in June 2002); and

6. Defendant Brinded—joined the CMD following Defendant Roels' resignation in July 2002.

*Id.* ¶ 106. The Complaint alleges that Defendant Boynton joined the CMD in 2003. *Id.* Members of the CMD report to a group called the "Conference," which is comprised of all of the members of the Supervisory Board and the Board of Management of Royal Dutch and the Directors of Shell Transport. *Id.* ¶ 107. The Conference, which acts without shareholder accountability, holds meetings regularly during the year. *Id.* ¶¶ 107–108. The alleged purpose of the Conference is to receive information from Group Managing Directors about major developments within the Shell Group and to review and discuss the business and plans of the Shell Group. *Id.* ¶ 108. The Shell Group's Annual Reports on Form 20–F define the Conference's responsibilities as follows:

The Conference reviews and discusses: the strategic direction of the businesses and of the Royal Dutch/Shell Group of Companies; the business plans of both the individual businesses and, of the Royal Dutch/Shell Group of Companies as a whole; major or strategic projects and significant capital items; the quarterly and annual financial results of the Royal Dutch/Shell Group of Companies; reports of the Group Audit Committee;

appraisals both of the individual businesses and of the Royal Dutch/Shell Group of Companies as a whole; annual or periodic reviews of Group companies' activities within significant countries or regions; governance, business risks and internal control of the Royal Dutch/Shell Group of Companies; a regular program of insights and briefings on specific aspects of the Royal Dutch/Shell Group of Companies; and other significant or unusual items on which the Group Managing Directors wish to seek advice.

*Id.* ¶ 108.

Decisions made by the Conference are not legally binding on either Royal Dutch or Shell Transport. *Id.* ¶ 109. Senior executives of the Shell Group companies attend Conference meetings and officers of each parent company must hold separate meetings during which they can make the decisions at which they arrived jointly in the Conference binding. *Id.* Additionally, Royal Dutch and Shell have established three joint committees to assist with the Shell Group's governance responsibilities; one of the committees relevant to the instant litigation is the GAC. *Id.* ¶ 110. The GAC "regularly considers the effectiveness of risk management processes and internal controls within the Group and reviews the financial accounts and reports of the Royal Dutch/Shell Group of Companies. The Committee also considers both internal and external audit reports (including the results of the examination of the Group Financial Statements) and assesses the performance of internal and external audit." *Id.* ¶ 111 (quoting the Shell Group's Forms 20–F).

### Oil and Gas Reserves

The term "reserves" generally describes the total volume of future oil production that can be expected to be commercially recovered from a reservoir, assuming that certain physical and economic conditions exist and continue to prevail for however long is required to obtain the production. *Id.* ¶ 113. Reserves can be divided into sub-categories such as proved and unproved; unproved reserves can further be divided into probable and possible. *Id.* ¶ 114. The classifications are based on the relative risk of recovery of the reserves in each category. The risk is defined as the likelihood that the expectations for future production and economic conditions will be met. *Id.* It is accounted for by assigning the anticipated future volume of oil production to a certain category of reserve based upon that risk. *Id.* In Rule 4–10, the SEC uses the term "reasonable certainty" to express a high degree of confidence that the estimated quantities will be recovered. *Id.* Rule 4–10(a) provides the definition of proved reserves for reporting purposes:

(2) **Proved oil and gas reserves.** Proved oil and gas reserves are the estimated quantities of crude oil, natural gas, and natural gas liquids which geological and engineering data demonstrate with reasonable certainty to be recoverable in future years from known reservoirs under existing economic and operating conditions, i.e., prices and costs as of the date the estimate is made. Prices include consideration of changes in existing prices provided only by contractual arrangements, but not on escalations based upon future conditions.

(3) **Proved developed oil and gas reserves.** Proved developed oil and gas reserves are reserves that can be expected to be recovered through existing wells with existing equipment and operating methods. Additional oil and gas expected to be obtained through the application of fluid injection or other improved recovery techniques for supplementing the natural forces and mechanisms of primary recovery should be included as "proved developed reserves" only after testing by a pilot project or after the operation of an in-

stalled program has confirmed through production response that increased recovery will be achieved.

(4) **Proved undeveloped reserves.** Proved undeveloped oil and gas reserves are reserves that are expected to be recovered from new wells on undrilled acreage, or from existing wells where a relatively major expenditure is required for recompletion. Reserves on undrilled acreage shall be limited to those drilling units offsetting productive units that are reasonably certain of production when drilled. Proved reserves for other undrilled units can be claimed only where it can be demonstrated with certainty that there is continuity of production from the existing productive formation. Under no circumstances should estimates for proved undeveloped reserves be attributable to any acreage for which an application of fluid injection or other improved recovery technique is contemplated, unless such techniques have been proved effective by actual tests in the area and in the same reservoir.

*Id.* ¶ 117. (quoting 17 C.F.R. § 210.4–10).

It is alleged that the Shell Group's publicly stated definition of "proved reserves" and "developed proved reserves," as stated in the Annual Reports filed with the SEC on Form 20–F, is in all material respects, identical to the SEC's definitions. *Id.* ¶ 118. While reserve reporting is a crucial indicator of how well a company is performing, other metrics are used by analysts and investors to assess the strength and future prospects of an energy company. *Id.* ¶¶ 119–120 (citing The Wall Street Journal, January 12, 2004). Other important metrics include: (a) Reserve Life, which compares barrels of proved reserves to annual actual production to answer, in terms of years, how long a company's proved reserves will last given the current production level; (b) Reserve Replacement Ratio, which compares additions to proved reserves to production (a RRR of 100% indicates that a company's proved reserves are being replenished at exactly the rate that the company is extracting/producing oil; a ratio of more than 100% indicates that a company is finding more hydrocarbons than it produces, thereby adding to its asset base; a ratio of less than 100% indicates that a company is depleting its proved reserves); and (c) Finding and Development Costs/Barrel, which are the costs of the process that results in the booking of proved reserves and then the extraction and sale of oil or natural gas. *Id.* ¶ 120.

*Overbooking of Proved Reserves*

In an article which appeared in the Wall Street Journal on March 12, 2004, it was reported that at the end of the first half of the 1990s, new discoveries were becoming harder to find, "as Middle Eastern countries expelled foreign oil companies and fields in the West matured." *Id.* ¶ 122. BPAmoco and ExxonMobil responded by buying up their rivals and selling off poor-performing fields; however the Shell Group primarily relied on organic growth through searching for big discoveries, and relied on drilling exploration wells in too many countries and in places where the size of any oil find would not be large enough to make a material difference. *Id.* ¶ 122. Between 1996 and 2000, the Shell Group allegedly spent $6 billion per year on finding new reserves. Analysts opined that the figure should have been much higher, closer to $9 billion. *Id.* Consequently, the Companies were replacing reserves at a much lower rate than originally represented, and the Companies' costs were significantly higher. *Id.* Rather than creating value through mergers and acquisitions[5], Shell sought to create value

5. The Complaint does state, however, that the Shell Group acquired Enterprise in April 2000 for $5.3 billion in equity and $2 billion in debt. *Id.* ¶ 123.

through cost-cutting, a strategy first implemented in 1998 by Defendant Moody–Stuart. *Id.* ¶ 123. The Complaint alleges that analysts complained that focusing on cost-cutting diverted the Shell Group's commitment to fund exploration and production when the price of oil began to recover, which ultimately cost the Shell Group the opportunity to find millions of barrels of hydrocarbon discoveries. *Id.* ¶ 123. This difficulty in finding new reserves allegedly translated into higher costs; thus it is estimated that between 1997 and 2002 the Shell Group's cost of finding and developing oil was $4.27 per barrel; higher than ExxonMobil's $3.93 and BPAmoco's $3.73. *Id.* ¶ 124.

In response to this failure to invest in finding new reserves, senior management, including the Individual Defendants, allegedly chose to manage the Shell Group's reserve figures much the way non-energy companies manage their earnings: to satisfy investors. *Id.* ¶ 126. Plaintiff alleges that this course of conduct was "directly contrary to the corporate transparency publicly advocated by Defendant Watts." *Id.* ¶ 126 (citing a Defendant Watts Speech, *A Business Approach to Earning Trust in Society,* KPMG Global Energy Conference, May 2003 ("It is not surprising trust in business has declined in the wake of a rash of corporate scandals. . . . I think there is every justification for people to question a business climate that allowed those things to happen. . . . We need to be transparent.")). It is alleged that in 1997 senior executives of the Shell Group instructed the leadership and performance group, "LEAP", to "create value through entrepreneurial management of hydrocarbon resource volumes." *Id.* ¶ 127 (quoting The New York Times, March 12, 2004). LEAP sought ways to change the Companies' guidelines with respect to classifying reserves. *Id.* ¶ 128. LEAP proposed that the Shell Group relax the accounting guidelines it used to book reserves. *Id.*

¶ 129 (citing London Times, March 28, 2004). The Group allegedly implemented the revised guidelines in four countries for the year ended December 31, 1997, and as a result the Group added 145.5 million boe in proved reserves for that year. *Id.* ¶ 130.

The following year, in 1998, the Group created five Value Creation Teams ("VCTs") to improve EP's profitability. *Id.* ¶ 131. The Complaint alleges that in a paper dated May 1998, Group Managers recommended, *inter alia,* that the Companies loosen their reserves guidelines. *Id.* ¶ 131 (citing *Creating Value through Entrepreneurial Management of Hydrocarbon Resource Values* ). On September 16, 1998, the Companies revised their reserves guidelines, and issued that revised guidance to their operating units. *Id.* This was confirmed by a former Group executive in an interview which appeared in The Wall Street Journal on March 18, 2004. The executive explained that the Group loosened the rules to allow gas reserve bookings with only a "reasonable expectation" of an available market. *Id.* ¶ 132. The SEC allegedly reported the following in a Cease and Desist Order,

> Shell instead revised its guidelines in 1998 to adopt a system under which it maintained its existing probabilistic methods for estimating proved reserves in "immature" fields, but applied more deterministic methods in "mature" fields, directing us to increase proved reserves in such fields to equal "expectation" volumes.

*Id.* ¶ 133.

It is alleged that the Companies used the term "expectation reserves" to mean "the most likely estimate of hydrocarbon volumes remaining to be recovered from a project that is technically and commercially mature, or from a producing asset." *Id.* ¶ 135. This practice deviated from the

Shell Group's early 1990s practice, which permitted executives to book proved reserves only if the Shell Group had signed a sales contract for the oil or gas. *Id.* ¶ 136. The Complaint alleges that, as revealed in the news media, the GAC Report, the Notice to Take Action [6] and the Cease and Desist Order, the new guidelines significantly inflated the Shell Group's reserves by enabling executives to book proved reserves well before making significant investments to get the oil and gas out of the ground. *Id.* ¶ 137. For the two years leading up to December 31, 1999, the Shell Group's revised guidelines resulted in an overstatement of the Group's proved reserves of 940 million boe. *Id.* ¶ 137. It is alleged that for the period 1998 through 2001, the SEC found that the change in guidelines caused the Shell Group to add more than 1.2 billion boe to reported proved reserves. *Id.* The Complaint alleges that the new guidelines were contrary to the SEC definition of proved reserves, which requires, *inter alia,* data indicating there is a "reasonable certainty" that oil or natural gas can be recovered through existing wells and equipment, and/or a plan of development has been approved. *Id.* ¶ 137.

The Complaint details numerous statements of former employees who allegedly had first-hand knowledge of these issues while employed by the Companies. *Id.* ¶ 138. Said employees contend that the Companies made no effort to apprise employees in the field of the SEC's requirements for classifying reserves as proved. *Id.* It is alleged that "[o]nly with the 2003 guideline revisions did the Companies require, for the first time, certainty of an existing market and a 'Final Investment Decision' on significant projects before reserves associated with the project could be classified as proved." *Id.* ¶ 139.

The guideline changes recommended by LEAP allegedly allowed the Group to increase its oil and gas reserves not by discovering major new sources, but by changing its accounting to add reserves it was uncertain could ever be produced. *Id.* ¶ 141. (citing a confidential internal review code-named Project Rockford). The London Times reported on March 22, 2004 that Defendant Watts, the then senior executive in charge of the EP unit, was able to tell 600 Group executives in June 1998 of the success of a special management program which had addressed a fundamental problem at the Companies, and that the Companies were producing oil and gas faster than they were finding new reserves. *Id.* ¶ 142. The Complaint alleges that Defendant Watts did not disclose the Companies' alleged relaxation of the reporting guidelines. *Id.*

In 2001, the SEC issued stricter guidelines for the calculation of reserves. *Id.* ¶ 144. Quoting from the GAC Report, the Complaint alleges that "[b]eginning in 2001, recognition of the strictures of SEC rules, in place since 1978, increased within the Company, in part due to the publication on the SEC website of SEC guidance regarding the importance of investment commitments and other indicia of 'reasonable certainty,' with a growing recognition that the Company's reserve numbers were not in full compliance with these rules." *Id.* ¶ 145. In 2002, Shell Group Executives developed a Potential Reserves Exposure Catalogue, which listed the major concerns of the current inventory. *Id.* ¶ 147. The Complaint alleges that in this Catalogue, "modest reductions in the volume of booked reserves were made, but most booked reserves were retained." *Id.* ¶ 147. It is alleged that according to a later report (the December 8th Report), "the view was taken that the exposures should in-

---

**6.** FSA's Final Notice to the Companies dated August 24, 2004. *Id.* ¶ 129.

deed be highlighted and addressed as a matter of priority, but that no corrective action was warranted in the meantime in relation to external disclosures." *Id.* The Complaint alleges that this did not comport with SEC rules as the Companies' guidelines did not require the Group to debook the reserves that no longer qualified as proved under the SEC rules. *Id.* 147.

### Defendants' Alleged Knowledge of the Group's Overbookings

The GAC Report states that as the Shell Group reported inflated proved reserves, senior Shell Group executives, including Watts and van de Vijver, communicated, via e-mail and meetings, about how to manage reserves to conceal the evidence. *Id.* ¶ 153. Citing the GAC Report, the Complaint alleges that "other executives and employees had, over time, varying degrees of exposure to the debate [between Van de Vijver and Watts] and, in various strata of management at Shell's Central Offices and in the field, involvement in the operations that were the subject of the bookings." *Id.* In a March 22, 2004, van de Vijver wrote the following:

> Soon after coming to office as head of EP in June 2001, I observed that the health of the EP business was not as robust as the Company-determined performance targets set under the former EP CEO. In fact, EP was in a far worse state in mid 2001 than was ever portrayed by my predecessor to senior management or the Conference.

*Id.* ¶ 154.

The Complaint, citing a confidential witness, alleges that prior to van de Vijver becoming the CEO of EP in 2001, he traveled to Houston, Texas and attended high level meetings with senior officers and directors of SEPCo and the Companies, including Defendant Miller. *Id.* ¶ 154a. It is alleged that at meetings in 2000 and 2001, van de Vijver "discussed many of the problems that should have

precluded the Companies from booking proved reserves in Nigeria." *Id.* The GAC Report further informed that Defendant van de Vijver "consistently pressed the position that reserves booked during Sir Philip's term were aggressive or premature, non-compliant with Shell Guidelines for booking and, implicitly, SEC rules." *Id.* 155.

Lead Plaintiff also claims that others, in addition to Defendant van de Vijver, had direct knowledge of the overstatements. The Wall Street Journal Europe reported on July 15, 2004, that Anton Barendregt (the Group Reserves Auditor during the Class Period) warned in a January 2002 memorandum, marked "confidential," that a portion of the 2001 mature reserves was at risk of being overstated. *Id.* ¶ 157. Allegedly, he also raised questions about the integrity of Shell's overall reserves-reporting system and warned that the Shell Group's guidelines for booking reserves were not in compliance with SEC guidelines in all cases. *Id.* ¶ 157. It was further reported that Barendregt circulated this memorandum to senior executives in the EP unit and to KPMG and PwC. *Id.* The article states that "three people familiar with the situation" confirmed that KPMG and PwC received the memorandum. *Id.*

A Note of Information, which summarized the Shell Group's reserves position as of December 31, 2001, was forwarded by van de Vijver to the CMD on February 11, 2002. *Id.* ¶ 158. In it, van de Vijver reportedly warned that proved reserve exposures were as high as 2.3 billion boe because of non-compliance with SEC guidelines. *Id.* The Note stated the following:

**Exposures**

**Securities and Exchange Commission (SEC) Alignment**

Recently the SEC issued clarifications that make it apparent that the Group guidelines for booking Proved Reserves are no longer fully aligned with the SEC rules. This may expose some 1,000 mln boe of legacy reserves bookings (e.g. Gorgon, Ormen Lange, Angola and Waddenzee) where potential environmental, political or commercial showstoppers exist.

**End of License**

In Oman PDO, Abu Dhabi and Nigeria SPDC (18% of EP's current production) no further proved reserves can be booked since it is no longer reasonably certain that the proved reserves will be produced within license. The overall exposure should the OU business plans not transpire is 1,300 mln boe. Work has begun to address this important issue.

*Id.* ¶ 158.

The Complaint, citing the GAC Report, states that "[t]he Note raised issues of sufficient concern to [Watts] that he required ... a further presentation be made to [the] CMD." *Id.* ¶ 159. The EP managers circulated the EP Business Appraisal for 2001 on February 20, 2002. According to the Financial Services Authority (Britain's regulator of publicly traded companies) ("FSA"), "[b]oth the 'Main Issues' section and the main body of the Appraisal stated that the SEC's guidance made it clear that the approach advocated by Shell guidelines was, in may cases, too aggressive and would be likely to affect future bookings in new fields such as Nigeria and possible existing bookings representing some 1,000 million boe." *Id.* ¶ 160. The Complaint alleges that the "FSA also noted that the [a]ppraisal also referred to reserves which could no longer be booked because of license expiry issues and production limitations amounting to an additional 1,000 million boe." *Id.*

On May 28, 2002 an e-mail was sent to van de Vijver by Defendant Watts. It stated:

> You will be bringing the issue to CMD shortly. I do hope that this review will include consideration of all ways and means of achieving more than 100% in 2002—to mix metaphors ... considering the whole spectrum of possibilities and leaving no stone unturned.

*Id.* ¶ 161.

On July 22, 2002, a second presentation was made to the CMD in a Note for Discussion submitted by van de Vijver. *Id.* ¶ 163. The Note allegedly identified oil and gas reserves that were "aggressive[ly]" booked. *Id.* It is alleged that the Note observed that without these bookings, in Gorgon and Nigeria, "total proved RRR over the past 10 years would be reduced from 102% to 88%." *Id.* ¶ 163. The GAC Report concluded:

> it is an example of a series of documents which suggest that EP management's plan was to 'manage' the totality of the reserve position over time, in hopes that problematic reserve bookings could be rendered immaterial by project maturation, license extensions, exploration successes and/or strategic activity. Simply put, it is illustrative of a strategy 'to play for time' in the hope that intervening helpful developments would justify, or mitigate, the existing reserve exposures.

*Id.* ¶ 164.

The minutes of the July 2002 CMD meeting allegedly recognize the delay in debooking could not continue indefinitely:

> It is considered unlikely that potential overbookings would need to be debooked in the short-term, but reserves that are exposed to project risk or licence expiry cannot remain on the books indefinitely if little progress is made to

convert them to production in a timely manner.

*Id.* ¶ 165.

On September 2, 2002, van de Vijver submitted a note to the CMD. The note, a copy of which was sent to Defendant Boynton, stated the following:

> Given the external visibility of our issues (lean organic development portfolio funnel, RRR low, F & D unit costs rising), the market can only be 'fooled' if 1) credibility of the company is high, 2) medium and long-term portfolio refreshment is real and/or 3) positive trends can be shown on key indicators.
>
> Unfortunately . . .:
>
> —We are struggling on all key criteria ("caught in the box") . . . .
>
> The immediate risk that we are facing is on the "negative spiral" of our boxed situation:
>
> . . .
>
> —RRR remains below 100% mainly due to aggressive booking in 1997–2000.

*Id.* ¶ 166.

In September 2002, van de Vijver wrote a confidential personal Note to File which stated the following:

> During the last 1.5 years the technical competence and overall integrity of the EP business within Shell has been questioned both internally and externally, most prominently through lowering of the production growth target in August/September 2001 and due to a deteriorating proved reserves replacement ratio. Providing credible explanations for these issues proved near impossible given the disconnects between external promises/expectations and the reality of the state of the business.
>
> . . .
>
> Bottomline was that both reserves replacement and production growth were inflated:

> —Aggressive/premature reserves bookings provided impression of higher growth rate than realistically possible.
>
> . . .
>
> The Concerns around the "caught in the box" dilemma and stretch in the EP business plans have been flagged at the highest level in the company, but obviously "transmitted" in a careful fashion as not to compromise/undermine the previous leadership. The severity and magnitude of the EP legacy issues may therefore not have been fully appreciated.

*Id.* ¶ 167.

The Complaint, citing the FSA, alleges that in September 2002 the Shell Group "created and implemented a reserves exposure catalogue to ensure a system of awareness and control of the proved reserves inventory." *Id.* ¶ 168 (internal citations omitted). The notes to the catalogue indicated that the reserves in some operating units would be at risk if production rate increases did not materialize. *Id.* Furthermore, the notes identified that certain bookings were threatened by clarifications to the SEC's rules by the Commission, requiring conservatism in the classification of proved reserves. *Id.* Shortly thereafter, on October 22, 2002, Defendant van de Vijver wrote to Defendant Watts and stated the following:

> I must admit that I become sick and tired about arguing about the hard facts and also cannot perform miracles given where we are today.
>
> If I was interpreting the disclosure requirement literally (Sorbanes [sic]-Oxley Act etc) we would have a real problem.

*Id.* ¶ 169.

Defendant van de Vijver circulated a brief on November 15, 2002 which outlined

business plan issues to members of his EP staff:

> We finalized our plan submission and could easily leave the impression that everything is fine.
>
> . . .
>
> The reality is however that we would not have submitted this plan if we
> 1) were not trying to protect the Group reputation externally (promises made) and
> 2) could have been honest about past failures (business focus w.r.t. aspired portfolio, disconnects with reality, poor performance management, reserves manipulation).

*Id.* ¶ 170.

On January 31, 2003, Barendregt wrote another "confidential" memorandum that he circulated to senior Shell Group executives in the EP unit, as well as to KPMG and PwC. *Id.* ¶ 171. The memorandum reviewed the prior year's reserves estimates and warned, *inter alia,* that the guidelines for booking reserves did not comport with SEC guidelines in all instances and raised questions about the integrity of the Companies' overall reserves-reporting system. *Id.* Furthermore, on February 28, 2003, van de Vijver sent Defendant Watts a copy of a February 23, 2003 e-mail in which van de Vijver stated to his EP staff:

> We know we have been walking a fine line recently on external Messages. . . . Promising that future reserves additions are expected in 2003 . . . whilst we know that there is some real uncertainty around this. . . . [W]e know our ongoing exposures on Oman/Nigeria reserves and on early bookings, notably Gorgon and Ormen Lange.

*Id.* ¶ 173.

On August 25, 2003, van de Vijver directed a draft of his Mid-year 2003 Review Summary to Watts, allegedly complaining that "The single largest issue facing EP is the shrinking opportunity portfolio exacerbated by too aggressive reserves bookings in the past. . . ." *Id.* ¶ 175. The Complaint alleges that on the following day, the GAC received a memorandum that addressed possible areas of non-compliance with Rule 4–10. *Id.* ¶ 176. The Complaint, citing the FSA, stated "[t]he GAC was advised that much, if not all, of the potential exposure arising from interpretation of the factors . . . is offset by Shell's practice of not disclosing reserves in relation to gas production that is consumed on site as fuel or (incidental) flaring and venting." *Id.* (internal citations omitted).

The Complaint alleges that on November 9, 2003, after receiving what he considered an unfairly critical performance review from Defendant Watts, Defendant van de Vijver e-mailed Watts and stated that he was "becoming sick and tired about lying about the extent of our reserves issues and the downward revisions that need to be done because of far too aggressive/optimistic bookings." *Id.* ¶ 178. One day prior, on November 8, 2003, van de Vijver wrote an e-mail to a colleague about the Group's aggressive reserves bookings which stated the following:

> As you know 2003 RRR is the most important share price influencer also as expectations are high and they do not know that we are still paying for aggressive reserves bookings [including thos[e] that have not reached FID yet !!] in the past!

*Id.* ¶ 179.

According to the GAC Report, in December 2002 and November 2003, Defendant van de Vijver considered the idea of a comprehensive de-booking of all known exposed reserves. *Id.* ¶ 182. It is alleged that in late November 2003, van de Vijver stated in a message to the Group Reserves Coordinator, "I would prefer to restate our 1/1/03 reserves and de-book all remaining

legacies to allow for a clean start." *Id.* The Complaint alleges that at the same time, however, van de Vijver delivered the following message to all senior EP executives in which he warned "[o]ne final word on 2003. It would be an enormous blow to the Group's credibility with the Market if we do not deliver on RRR this year." *Id.*

On December 2, 2003 a memorandum was prepared by the EP staff. This memorandum, titled "Script for Walter [van de Vijver] on the proved reserves position," assumed that approximately 2.3 billion boe of proved reserves were non-compliant and that this was material to the market. *Id.* ¶ 183. The script stated:

> If and from the time onwards that it is accepted or acknowledged by the management of the issuers (Royal Dutch and STT), that, when applying the SEC rules, the 2002 proved reserves as reported in the Form 20–F are materially wrong, the issuers are under a legal obligation to disclose that information to all investors at the same time and without delay. Not to disclose it would constitute a violation of U.S. securities law and the multiple listing requirements. It would also increase any potential exposure to liability within and outside the US. Note that the reserves information also appears in the non 20–F Annual Reports.
>
> Disclosure cannot await the next Form 20–F appearing in April, 2004.

*Id.* ¶ 183.

The Complaint alleges that on the same day the script was provided to van de Vijver, he e-mailed one of its authors, the EP unit's head of finance, Frank Coopman, and demanded that the e-mail be destroyed. "This is absolute dynamite, not at all what I expected and needs to be destroyed." *Id.* ¶ 184.

### *Geographic Areas*

### Australia

As of December 31, 1997, when Watts was head of EP, the Companies booked as proved approximately 557 million boe of natural gas relating to the Gorgon fields. *Id.* ¶ 187. The Gorgon fields are undeveloped frontier gas fields located 70 miles off the northwestern coast of Western Australia. *Id.* It is alleged that the amount booked from the Gorgon fields represents more than 12% of the Companies' total overbooked reserves. *Id.* The Complaint alleges that in order to "disguise the improper booking, the Companies recorded the reserves not as 'new discoveries,' which garner more attention from auditors and investors and could have been challenged more easily internally, but instead as 'revisions'." *Id.* ¶ 188. Ordinarily, however, "revisions" are intended for "subsequent adjustments to previously reported reserves, not for reserves that have yet to be recorded as proved." *Id.* It is alleged that Defendant van de Vijver later publicly portrayed the misclassification as a mistake and an embarrassment. *Id.* The Complaint further describes the Gorgon Venture and its relation to the overbooking. *See* Compl., 189–203. It is alleged that in 1999, the Companies revisited the status of the Gorgon booking at several points. *Id.* ¶ 204.

### Nigeria

The Complaint alleges that since the late 1970s, the oil and gas industry has been the backbone of the Nigerian economy, accounting for over 90% of total foreign exchange earnings. *Id.* ¶ 208. In the 1990s, the Nigerian deep and ultra-deepwater areas became the focus of major exploration by foreign oil companies and the first success came in 1993 with the discovery of the Bonga oil and gas field. *Id.* ¶ 209. The Bonga field is the first deepwater project for the Shell Petroleum

Development Company of Nigeria, Ltd. ("SPDC") and for Nigeria. *Id.* ¶ 210. It is alleged that the SPDC operates the field on behalf of the Nigerian National Petroleum Corporation under a production-sharing contract, in partnership with Esso (ExxonMobil) (20%), Nigeria Agip (12.5%), and Elf Petroleum Nigeria Limited (12.5%). *Id.* ¶ 210. The Bonga project was beset with problems, which made proved reserves classification improper and allegedly in violation of SEC guidelines. *Id.* ¶ 216. The Complaint alleges that by 1999, "the SPDC had booked reserves based upon the Shell Group's 1998 revised guidelines and forecasts that, as the SEC noted, 'gave the appearance that the proved portion of the reserves could be produced within the remaining license period'." *Id.* ¶ 217. However, the SEC found "none of these assumptions was reasonable, particularly in light of the fact that SPDC's operations performed well below the projected levels throughout the period." *Id.* It is also alleged that management decided to conceal the reserves problem from the investing public. *Id.* ¶ 224. The Complaint points to certain regional factors, such as poor infrastructure, a lack of government financing. and political and ethical strife in the Niger Delta region, which contributed to the Companies' inability to manage reserves. *Id.* ¶¶ 225–232.

It is alleged that internal documents show that the Shell Group concluded that more than 1.5 billion barrels, or 60% of its Nigerian reserves, did not meet SEC standards for proved reserves. *Id.* ¶ 235. Furthermore, Lead Plaintiff alleges that "at the end of 2002, the Shell Group recorded 2.524 billion barrels of proved reserves in Nigeria, but as the December 8th Report found, only 990 million barrels 'fully complie[d]' with SEC guidelines. Internal documents show that senior managers were told in December 2002 that 720 million barrels in Nigeria were 'noncompliant'

with guidelines established by the SEC, and that a further 814 million barrels were 'potentially noncompliant'." *Id.* ¶ 242.

**Oman**

The Shell Group has been involved in developing Oman's natural resources since oil was first discovered there in the 1930s. *Id.* ¶ 248. It is alleged that the Group owns 34% of Petroleum Development Oman ("PDO"), Oman's dominant oil and gas exploration company. *Id.* The other partners are the Omani government (60%), Total (4%) and Partex (2%). *Id.* Since 1997, oil production in Oman has declined. *Id.* ¶ 250. Horizontal drilling, which can extract a higher percentage of oil from certain fields and recover oil more efficiently than traditional vertical drilling, was not effective in Oman and resulted in large amounts of water being produced with oil, in contrast to the original expectation that less water would be produced with the oil. *Id.* ¶¶ 251–253.

Lead Plaintiff alleges that "by the end of 2000, despite the production decline in Oman, the Group and PDO determined to increase PDO's proved reserves estimates." *Id.* ¶ 261. "Based on the 1998 revisions to the Shell Group's guidelines, the Companies revised PDO's proved reserves upward 'by assuming that, for fields of certain maturity, both proved developed and proved undeveloped reserves would be increased to equal the expectation [for] developed and undeveloped volumes'." *Id.* It is alleged that the increase added 251 million boe to the Shell Group's reported proved reserves as of December 31, 2000, a 40% overstatement. *Id.* Furthermore, citing the GAC Report, the Complaint states that "the reserve overstatement stemmed from insufficient technical work that was done to support the increase in reserves." *Id.* ¶ 264. The serious production declines which were suffered thereafter and the increased reserves were main-

tained based upon "aspirational production targets." *Id.* It is further alleged that the Shell Group's interest in increasing shareholder value in the short-term played a part in the overvaluation of the reserves: because its license expired in 2012, it emphasized producing more oil sooner. *Id.* ¶ 265.

### Norway (Ormen Lange)

The Ormen Lange field is located approximately 140km west of Kristiansund, Norway. *Id.* ¶ 269. The field, which is the second-largest gas discovery on the Norwegian continental shelf, was well drilled in 1997. *Id.* Licenses for the development and production of the field are held by: Norske Shell ("Shell Norway")(16%), Norske Hydro Produksjon ("Norske Hydro") (14.78%), Statoil (8.87%), State's Direct Financial Interest ("SDFI") (45%), BPAmoco Norge ("BP") (9.44%) and Esso Norge ("ExxonMobil")(5.91%). *Id.* ¶ 270. Since 1997, the project partners have encountered technical challenges involving harsh deep-water conditions, bitter weather conditions, freezing water temperatures, and an uneven seabed. *Id.* ¶ 272. Because of such problems, in June 2001 the project partners decided to modify the time frame for developing the field. *Id.* ¶ 279. The Complaint alleges that "[e]ven as late as 2003, the project's partners were still struggling to determine whether European markets could absorb the supply of natural gas from the field. Consequently, the project partners extended the schedule for delivery of the plan for development and operation [ ] to the Norwegian authorities until the fall 2003." *Id.* ¶ 279. The production is presently projected to commence in the fall of 2007. *Id.* ¶ 280.

The Complaint alleges that unlike its project partners, the Companies began booking reserves from the Ormen Lange field years before the Shell Group and its partners were able to overcome the hur-

dles of the project. *Id.* ¶ 281. To that end, in 1999, the Companies started booking gas reserves before an appraisal well was drilled or before either a feasibility or a safety study was conducted. *Id.*

### Proffered False and Misleading Statements and Omissions

The Complaint alleges numerous allegedly false and misleading statements and omissions proffered by Defendants between 1999 and 2003. *See* Compl., ¶¶ 300–462. This Court incorporates said allegations by reference.

### Truth about Reported Reserves

On January 9, 2004, the Shell Group stated that it would reduce its reserves holdings by 20%. *Id.* ¶ 463. The reduction contemplated the reclassification of 3.9 billion barrels of oil and gas, one-fifth of the Companies' proved reserves. *Id.* On January 9th, Shell Transport's ADRs fell by 6.96% and Royal Dutch's ordinary shares (in the U.S.) fell by 7.87%. *Id.* ¶ 464. On March 3, 2004, Defendant Watts and Defendant van de Vijver were forced to resign from their positions. *Id.* ¶ 466. On March 18, 2004, a stock exchange release was filed with the SEC and the Shell Group announced further downward restatements of proved reserves for oil and natural gas. *Id.* ¶ 469. The Companies stated that the equivalent of 250 million barrels of oil were being reclassified because they did not comply with SEC regulations and another 220 million boe, which as recently as February 2004 were expected to be booked as proved for the year ended 2003, would not be included. *Id.* ¶ 469.

On April 19, 2004, the Shell Group cut reserves for a third time, by an additional 300 million barrels. *Id.* ¶ 474. In an interview that same day, Defendant Brinded explained the following:

[E]ssentially back in early March we established that we had a problem with the Ormen Lange booking and when we looked into it, it caused us some concerns that there might be wider-spread issues to deal with. So we set in train immediately in early March an exercise involving external experts from Ryder Scott together with our own teams to look at those reserves which we felt might be most at risk. After just a few days of that exercise we had covered 40 per cent of the reserves base and we realised that we had a material reduction to book, or to de-book, and we announced that on the 18th March—a reduction of 470 million barrels. At that point, I said that we were going to go on and complete the exercise on the worldwide reserves base.

In the last four weeks that's what we've done, 300 fields have been reviewed. In fact, reductions have been made now in total to almost 100 fields and we've covered 90 per cent of our fields. That's all but the very small fields essentially. So we've now completed that exercise, as a result of this latest phase, with a further reduction of some 300 million barrels for the pre–2003 reserve base and a reduction of some 200 million barrels in what we would otherwise have been booking in 2003.

. . .

But what is clear is that our competitive position in reserves, our recent reserves replacement ratio, and the current lifetime of our reserves doesn't leave us that well placed competitively . . .

. . .

[T]he change is really . . . a result of this third tranche. . . . [E]ssentially we're looking at a different type of field . . . , one-third of them are in proved developed reserves category. In the past we've been stressing that 90–95 per cent of the reductions were in the under-developed category and only a very small proportion in the developed category. This time about a third are in the proved developed category.

The distinguishing feature being that proved developed means it is on stream, it's producing. You've built the platform, you've drilled the wells, it's producing oil. That means you're starting to depreciate the asset and you depreciate it based on a proportion of the production in that year divided by the total proven reserves base. So if you shrink your proven reserves base, then you should be depreciating more in that year. So when we have to make revisions to proved developed reserves, we have to go back and make a change to the depreciation calculation and that change is your net income and that's why there is a material financial impact.

. . . [I]n terms of materiality though I just want to stress it averages something like $100 million a year over the last four years.

*Id.* ¶¶ 474–477.

On May 24, 2004, for the fourth time that year, the Companies downgraded the size of their proven oil and gas reserves. *Id.* ¶ 480. The Companies stated that the reduction, which involved an additional 103 million barrels, reflected "an adjustment with respect to royalties paid in cash in Canada." *Id.* That same day, the Shell Group announced that as a result of its shift toward using stricter American accounting rules for all its accounts, rather than a combination of Dutch and American rules, it would restate certain of its financial results for 2001, 2002 and 2003. *Id.* ¶ 481.

### SEC Investigation and Other Regulatory Actions

On August 24, 2004, the SEC issued a Cease and Desist Order in which it concluded:

a. The Companies violated Section 10(b) of the Exchange Act and Rule 10b–5 thereunder. The Companies knowingly or recklessly reported proved reserves that were non-compliant with Rule 4–10, and failed (i) to ensure that the Companies' internal proved reserves estimation and reporting guidelines complied with Rule 4–10, and (ii) to take timely and appropriate action to ensure that their reported proved reserves were not overstated in their filings with the SEC and other public statements. b. The Companies violated Section 13(a) of the Exchange Act and Rules 13a–1 and 12b–20 thereunder. The Companies' failures to ensure that they estimated and reported proved reserves accurately in compliance with Rule 4–10 caused them to file Annual Reports on Form 20–F for the years 1997 through 2002 that were materially inaccurate, in that they overstated the Companies' reported reserves and accompanying supplemental information, including the standardized measure of future cash flows. c. The Companies violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act. The Companies failed to create and maintain accurate estimates of their proved reserves in compliance with Rule 4–10, and failed to ensure that they implemented and maintained adequate controls with respect to their reserves processes, sufficient to provide assurance that the reserves were estimated and reported accurately in accordance with Rule 4–10.

*Id.* ¶ 296.

A separate civil action was filed simultaneously with the proceeding that was the subject of the Cease and Desist Order. *Id.* ¶ 298. In that action, *SEC v. Royal Dutch Petroleum Co. and the "Shell" Transport and Trading Company, p.l.c.*, No. H–04–3359, 2004 WL 2195811 (S.D.Tex. Aug.24, 2004), Royal Dutch and Shell Transport consented to the entry of a judgment by the U.S. District Court for the Southern District of Texas, Houston Division, pursuant to Section 21(d) of the Exchange Act, ordering the Companies, together, to pay a $1 disgorgement and a $120 million civil penalty. *Id.*

The FSA also issued a Final Notice to Shell Transport and Royal Dutch to Take Action, in which the FSA imposed a penalty of £17 million for "market abuse" and breaches of the FSA's Listing Rules. *Id.* ¶ 299.

### Claims for Relief

Lead Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3). *Id.* ¶ 499. The putative Class consists of all persons who purchased Royal Dutch ordinary shares and Shell Transport ordinary shares and ADRs on the open market during the Class Period. *Id.* Plaintiff claims that the potential members of the Class are so numerous that joinder of all members is infeasible because, during the Class Period, there were more than two billion outstanding shares of Royal Dutch common stock trading in Amsterdam, more than 520 million outstanding shares of Royal Dutch common stock trading on the NYSE, more than 9.6 billion outstanding shares of Shell Transport common stock trading in London, and more than 48 million outstanding Shell Transport ADRs trading on the NYSE. *Id.* ¶ 500. The Complaint contains five claims for relief which are summarized below. *Id.* ¶¶ 505–593.

Count I is asserted against both the Individual and Company Royal Dutch/ Shell Transport Defendants under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b). Compl., ¶¶ 506–511. Count II alleges the same claim against Defendants PwC and KPMG. *Id.* ¶¶ 512–535. Count

III is brought against the Individual Defendants who allegedly acted as controlling persons of the Companies within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). Compl., ¶¶ 536–539. Finally, Counts IV, seeking damages, and V, seeking equitable relief, are brought pursuant to Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a) against Royal Dutch and Shell Transport. Compl., ¶¶ 540–593.

## DISCUSSION

### I. *Rule 12(b)(1) Motion to Dismiss for Lack of Subject Matter Jurisdiction*

### A. **Standard of Law Applied to Motions to Dismiss Pursuant to Fed.R.Civ.P. 12(b)(1)**

Challenges to subject matter jurisdiction through a Fed.R.Civ.P. 12(b)(1) motion to dismiss come in two different forms—facial and factual attacks. A facial attack questions the sufficiency of the pleading. In reviewing a facial attack, a trial court accepts the allegations in the complaint as true. When a court reviews a complaint under a factual attack, however, the allegations have no presumptive truthfulness, and the court that must weigh the evidence has discretion to allow affidavits, documents, and even a limited evidentiary hearing to resolve disputed jurisdictional facts. 2 Moore's Federal Practice, § 12.30[4](Matthew Bender, 3d ed.). In the instant case, Defendants are not attacking the existence of subject matter jurisdiction on the face of Plaintiff's complaint, but rather are making a factual attack. Accordingly, this Court is not confined to the allegations in Plaintiff's Complaint, but may consider the affidavits, certifications, exhibits and deposition testimony submitted to this Court to resolve the factual issues bearing on jurisdiction. The Court must be careful, however, not to allow its consideration of jurisdiction to spill over into a determination of the merits of the case, and thus must tread lightly in its consideration of the facts concerning jurisdiction. *Dugan v. Coastal Indus., Inc.,* 96 F.Supp.2d 481, 483 (E.D.Pa.2000).

The party invoking jurisdiction, in this case the Lead Plaintiff, bears the burden of establishing that such jurisdiction exists. *McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178, 182, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); *Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1409 (3d Cir.), *cert. denied,* 501 U.S. 1222, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991). However, the burden is light; dismissal for lack of jurisdiction is only appropriate where the right claimed "is so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as to not involve a federal controversy." *Dugan,* at 483 (citing *Growth Horizons, Inc. v. Delaware County,* 983 F.2d 1277, 1280–81 (3d Cir.1995)).

### B. **Application**

The RDS Defendants, the Individual Defendants, KPMG NV, KPMG International, PwC UK and PwC International move to dismiss Lead Plaintiff's claims that are asserted on behalf of putative class members who are foreign nationals and who purchased their shares on foreign exchanges. Defendants argue that the United States was not the location of "substantial and material" conduct by the Companies because the Companies are European companies with a largely European shareholder base that run their most vital operations from their respective European headquarters. Defendants contend that of the 11.7 billion combined Royal Dutch and Shell Transport shares held worldwide, roughly 92 percent are traded outside the United States. *See* RDS Br. in Support of Motion to Dismiss for Lack of SMJ, at 7. For the reasons which follow, Defendants'

motion to dismiss for lack of subject matter jurisdiction is denied.

**Conduct in the United States**

■ Federal courts employ two judicially created tests to determine the existence of subject matter jurisdiction over foreign transactions: the effects test, which considers whether conduct outside the United States has had a substantial adverse effect on United States investors or United States securities markets, and the conduct test, which questions whether conduct within the United States is alleged to have played some part in the perpetration of a securities fraud on investors outside of this country. *Tri Star Farms Ltd. v. Marconi, PLC,* 225 F.Supp.2d 567, 572–73 (W.D.Pa.2002)(citing *Robinson v. TCI/US W. Communications Inc.,* 117 F.3d 900, 905 (5th Cir.1997)). Jurisdiction is established by satisfaction of either test. *Id.*

■ In the present motions, Defendants do not challenge this Court's subject matter jurisdiction over the claims of domestic investors who purchased on domestic or foreign exchanges, nor do they contest this Court's jurisdiction over the claims of foreign investors who bought ordinary shares or ADRs on the NYSE. Rather, Defendants challenge this Court's jurisdiction over the claims of the putative foreign class members who purchased their securities on foreign exchanges. Such investors did not suffer the effects of Defendants' alleged misconduct in the United States, and therefore this Court will proceed under the conduct test.

When analyzing subject matter jurisdiction in the context of transnational securities fraud, the Third Circuit has held that the federal securities laws grant jurisdiction where at least some activity designed to further a fraudulent scheme occurs within this country. *SEC v. Kasser,* 548 F.2d 109, 114 (3d Cir.1977). The Court, relying on the prior pronouncements by the Second Circuit in *IIT v. Vencap, Ltd.,*

519 F.2d 1001 (1975) and *Bersch v. Drexel Firestone, Inc.,* 519 F.2d 974 (2d Cir.1975), concluded that its ruling was "limited to the perpetration of fraudulent acts themselves and does not extend to mere preparatory activities or the failure to prevent fraudulent acts where the bulk of the activities were performed in foreign countries...." *SEC v. Kasser,* at 114 (quoting *IIT,* at 1018). In *Kasser,* the Third Circuit concluded that the conduct of the defendants in the United States, which included various negotiations, the execution of a contract at issue, incorporation of some of the defendant companies and maintenance of pertinent records, could not be deemed to be "mere[ly] preparatory" to fraudulent acts committed outside the country. *Kasser,* at 115.

The Third Circuit also set forth three policy justifications for its decision. *Id.* at 116. First, the Court stated that "to deny such jurisdiction may embolden those who wish to defraud foreign securities purchasers or sellers to use the United States as a base of operations." *Id.* The Court added that it was "reluctant to conclude that Congress intended to allow the United States to become a 'Barbary Coast,' as it were, harboring international securities 'pirates'." *Id.* Second, the *Kasser* Court announced its concern "that a holding of no jurisdiction might induce reciprocal responses on the part of other nations," which would in turn "enable defrauders beyond the reach of our courts to escape with impunity." *Id.* Finally, the Court opined that the antifraud provisions of the 1933 and 1934 Acts were "designed to insure high standards of conduct in securities transactions within this country in addition to protecting domestic markets and investors from the effects of fraud." *Id.* The Court reasoned that finding jurisdiction would enhance the ability of the SEC to "police vigorously the conduct of securi-

ties dealings within the United States." *Id.*

In the case at bar, Defendants suggest that the facts do not establish the "significant and material" conduct within the United States that is necessary to establish subject matter jurisdiction; instead, Defendants argue that the "focal point" of the alleged fraudulent activity was the United Kingdom and The Netherlands. *See* RDS Br. in Support of Motion to Dismiss for Lack of SMJ, at 18. To support this argument, RDS submits the declarations of (1) John Darley, the Director of EP Technology with Shell International Exploration and Production, N.V., (2) Roger Parkins, Senior Legal Counsel with Shell International B.V. ("SIBV"), and (3) Bart van der Steenstraten, Group Finance Representative, The Hague, Netherlands and Investor Relations Manager Continental Europe of Shell International, B.V.

In 2003, Darley was asked to lead a team which reviewed Shell's "proved" reserves. *See* Darley Decl., ¶ 3, Attached to RDS Br. in Support of Motion to Dismiss for Lack of SMJ. This project, which became known as "Project Rockford," eventually led to the Companies' recategorization. *Id.* According to Darley, the Companies report "proved" reserves to investors as supplemental information to the financial statements contained in the Annual Reports and the Form 20–F filings with the SEC. *Id.* ¶ 4. This data is compiled in an annual process known as the Annual Review of Petroleum Resources ("ARPR"). *Id.* ¶ 5. The reporting of hydrocarbon resources (including oil, gas and natural gas liquids) in the ARPR process involves the collection of data on existing hydrocarbon resources from Royal Dutch's and Shell Transport's Operating Units around the world. *Id.* The manner in which the Companies' Operating Units are instructed to report their hydrocarbon resources, including "proved"

reserves, is consistent with internal guidelines that are prepared and published each year by the Group Reserves Coordinator ("GRC") in The Netherlands. *Id.* ¶ 6.

The GRC is also responsible for compiling and consolidating the Group's final proved reserves figures, including the annual RRR, for inclusion in the Companies' Annual Reports and the 20–F filings. *Id.* Defendants contend that throughout the Class Period, the ARPR process was reviewed by a Group Reserves Auditor, a part-time consultant to Shell who performed his reviews in The Netherlands. *Id.* ¶ 7. Defendants admit that during the year, the Group Reserves Auditor traveled worldwide to audit the petroleum resources recorded by Operating Units in various countries; however, it is argued that the Auditor performed only two audits of any Operating Unit based in the United States during the Class Period, and that one of those audits was a joint venture involving Shell and ExxonMobil. *Id.* ¶ 8.

During the course of the ARPR process a Netherlands-based affiliate of KPMG monitored the reports of hydrocarbon resources. *Id.* ¶ 9. At the conclusion of the ARPR process and after receiving the report from the Auditor, the KPMG affiliate issued a statement outlining the results. *Id.* Defendants note that all work was performed by the KPMG affiliate in The Netherlands and the statements of results were delivered to Royal Dutch in The Netherlands and Shell Transport in the United Kingdom. *Id.*

Furthermore, Darley proposes that although some of the reserves recategorizations the Companies have announced are located in the United States, none of the proved reserves that Royal Dutch and Shell Transport have restated in prior years was located in the United States. *Id.* ¶ 10. He explains that as part of the

reserves recategorization, Royal Dutch and Shell Transport said they had recorded a downward revision of 172 million boe of proved reserves due to the SEC's clarification of the requirements for determining the "lowest known hydrocarbon" in an oil or gas field. *Id.* The total, roughly 59 million boe of revisions as of the end of 2003, did not form part of the restatement of prior years. *Id.* In his declaration, Darley highlights the fact that relevant conduct occurred in The Netherlands; however, this does not detract from his clear submissions that other relevant conduct occurred within the United States. This includes 59 million boe of revisions and the audit of two operating bases in the U.S.

Plaintiff submits that the conduct in the United States falls into three categories, each of which are fully discussed below: (1) the calculation and determination of proved reserves by SDS in Houston, Texas for Group Operating Companies; (2) reserves audits undertaken by Barendregt at SDS in Houston; and (3) presentations made to analysts and investors throughout the United States.

### (1) Shell Deepwater Services in Houston, Texas

SDS, which was formed in 1999 and fragmented in mid-2003, was responsible for dealing with the deep water activities of the Shell Group. *See* Darley Dep., 22:3–23:9, Attached to Decl. of Mark T. Millkey in Support of Lead Pl. Br. in Opp'n to Defendants' Motion to Dismiss in Part for Lack of SMJ ("Millkey Decl."), Ex. 1. Darley explained that SDS evaluates deepwater hydrocarbon accumulations and has the geological and geophysical expertise to map the size of the accumulation and define the aerial extent of the accumulation. *Id.* 23:14–24:2. SDS also defines the development plan for the recovery of the hydrocarbon resources in the accumulation, which consists of defining "how many wells are required, at what depth

should the wells be drilled, at what rate should the wells be produced," as well as "what kind of facilities and infrastructure will be needed to recover the hydrocarbons." *Id.* 24:3–24:12. Darley testified that "all that work, whenever it was related to deepwater accumulations, because deepwater accumulations require specialists expertise and specialist knowledge, ... was executed by Shell Deepwater Services." *Id.* 24:21–24:25. Darley added that Shell Deepwater Services was involved in all aspects of resource definition, including the estimation and calculation of reserves. *Id.* 25:2–27:2.

Darley's deposition testimony also highlighted the role played by SDS in the calculation of the fields in Nigeria and Angola. Darley explained the procedure the Companies employed in gathering and reporting its proved oil and gas reserves during the Class Period. The process begins with a request from the hydrocarbon resources coordinator and reserves coordinator, which is then sent to all of the operating units instructing them to prepare the year-end reserve submissions. *See* Darley Dep., 51:8–52:16. Once the request is sent, the operating units prepare their reserves and resource definition for their areas of responsibility. *Id.* 52:20–53:3. Darley explained that it is the operating units responsibility to define their reserves and resources, and if they are well defined and understood, they would not need any involvement from SDS. However, if SDS is requested to do so, it may provide technical support in the form of information or clarity from the consultant or from the contractor who is performing the technical work on the field development, to the operating unit. *Id.* 53:3–54:25. To that end, Darley testified that "SDS provided technical support to both Angola, Shell Development Angola, who [were] preparing their own submission of the year-end reserves, and also to the deep

water company in Nigeria, SNEPCO ..., when they were also preparing their year-end submission reserves." *Id.* 55:10–17.

Plaintiff submits that SDS was deeply involved in the calculation and evaluation of proved reserves in the Bonga, Erha, and Abu fields of Nigeria, all of which were being developed by Shell Nigeria Exploration and Production Company ("SNEPCO"). *See* Lead Pl. Br. in Opp'n to RDS Motion to Dismiss for Lack of SMJ, at 6. In its opposition brief, Lead Plaintiff also makes reference to numerous articles and e-mails which support the position that SDS was actively working on reserves calculations for this area. *See* Lead Pl. Br. in Opp'n to RDS Motion to Dismiss for Lack of SMJ, at 6–7.

Lead Plaintiff also cites numerous e-mails and documents in support of the position that SDS was actively working on reserves calculations in Angola. *See* Lead Pl. Br. in Opp'n to RDS Motion to Dismiss for Lack of SMJ, at 8–10. One such reference is a November 2000 e-mail authored by then head of SDS, Matthias M. Bichsel. Mr. Bichsel wrote the following to Heinz Rothermund, the Group's regional director for South America and Africa:

> I am responding to your e-mail from 29th October regarding reserves booking in Angola. I attach a note that addresses the issue in the wider context of West Africa, since we are also working on identifying additional volumes in Bonga.
>
> As you will have heard already, the earlier quoted figures of some 300 MMB of proved reserves to be booked in 2000 were incorrect and represent volumes of entire structures rather than what can be booked with confidence in 2000, and in accordance to SEC rules and Shell guidelines.
>
> I can assure you that I am personally pushing and cajoling my staff to get the most out of what is possible. Contrary

to what you have heard, we are not "covering our back side" and are "overly conservative" but are exploring every avenue to trying [sic] to increase reserves bookings.

> The current total reserves booking potential is, on a P50 basis, 195 to 315 MMB and on a P85 (proved) basis 130–190 MMB. I have asked for another set of eyes of reservoir engineering expertise from SepTAR and SEPCo to ensure that we are not missing anything and literally leave no stone unturned at our next peer review session.

*See* SMJ00017266, Attached to Millkey Decl., Ex. 3.

Defendants' reply brief provides additional information about the context of the aforesaid e-mail; however, rather than supporting Defendants' position, it only serves to reinforce the fact that portions of the reserves calculated by the SDS were in fact overstated and recategorized. *See* RDS Br. in Support of Motion to Dismiss for Lack of SMJ, at 12–14; *see also* Supplemental Decl. of John Darley.

Defendants submit Roger Parkins' declaration to support the conclusion that senior-level oversight of the reserves setting and reporting processes occurred in the United Kingdom and The Netherlands, and not in the United States. However, the Third Circuit's test for determining subject matter jurisdiction in transnational securities cases does not require a finding of no jurisdiction if material, substantial conduct occurs *outside the United States.* Rather, the test is whether material, substantial conduct occurred *in the United States* in pursuit of the fraudulent scheme. If Plaintiff pleads and supports sufficient allegations to sustain this burden, it will defeat Defendants' motion to dismiss, regardless of the quantity and quality of activity which occurred in The Netherlands and the U.K.

### (2) Audits at SDS in Houston

Lead Plaintiff refers to a portion of Darley's declaration stating that during the Class Period, Anton Barendregt performed two audits of the United States' Operating Units. While Lead Plaintiff does not facially attack the veracity of this statement, it cites numerous documents, produced by Defendants, which demonstrate that Barendregt made repeated trips to Houston, TX during the Class Period either to audit operating units located outside the United States, or to contribute in the booking of reserves. *See* Lead Pl. Br. in Opp'n to RDS Motion to Dismiss for Lack of SMJ, at 10–12.

### (3) Investor Relations in the United States

The Companies had three main investor markets worldwide—Europe, the United Kingdom and North America. The Companies had Investor Relations offices in London, The Hague and New York. *See* Lead Pl. Br. in Opp'n to RDS Motion to Dismiss for Lack of SMJ, at 12. Darley testified that it was the function of the Investor Relations Office "to promote the company strategies and the company performance among the investor analyst community." Darley Dep., 145:17–21.

The source for much of Lead Plaintiff's information regarding investor relations is Mr. Simon Henry who, beginning in March 2001, was "responsible for all of the communications to investors worldwide, across the three main investor markets, Europe, the U.K. and North America." *See* October 19, 2004 Deposition of Simon Henry before the SEC, 16:16–22, Attached to Millkey Decl., Ex. 43. Henry explained that he was responsible for the communications strategy including quarterly results reporting and the reporting of any significant events. *Id.* 16:23–17:3. The New York Office of Investor Relations was headed by David Sexton who, in September 2003, was replaced by Harold Hatchett. *Id.* 18:15–17. Henry testified that the Investor Relations Group conducted between 200 and 300 in-person meetings per year with executives in 2002 and 2003. *Id.* 21:14–17. Henry added that the top 50 investors in each market were the priority, and each would have the opportunity, at least once a year, to meet with the senior executives (a managing director or the director of finance). *Id.* 21:21–22:4.

In addition to the small group meetings, Investor Relations group executives would travel to cities in the U.S. including Boston, New York, Los Angeles, San Francisco, San Diego, Denver and Philadelphia. *Id.* 24:13–20. Henry testified that the Group would try to visit New York "two or three times a year," and the other cities "once a year or once every two years." *Id.* Henry added that in 2002 and 2003, because of poor reviews, the Investor Relations group tried to limit Mr. van de Vijver's contact with outside investors in the U.K. and the U.S. Relatedly, he testified that the U.S. market was by and large reserved for Philip Watts and Judy Boynton, and on occasion, the president of Royal Dutch. *Id.* 138:23–139:24. Lead Plaintiff also makes reference to numerous documents which demonstrate that representatives of the Companies addressed reserves and/or RRR at the United States meetings and presentations. *See* Lead Pl. Br. in Opp'n to RDS Motion to Dismiss for Lack of SMJ, at 13–14; *see also* Millkey Decl., Exs. 44–61.

Defendants argue that the inclusion of allegedly misleading statements created abroad in SEC filings and other public statements in the United States cannot establish subject matter jurisdiction under the conduct test. *See* RDS Br. in Support of Motion to Dismiss for Lack of SMJ, 27–28. To support their position, Defendants cite a host of cases, one of which is *Tri–*

*Star Farms, Ltd. v. Marconi, PLC,* 225 F.Supp.2d 567 (W.D.Pa.2002). In *Marconi,* the court noted that the "only fraudulent conduct alleged to have taken place in the United States is the inclusion of some of the purported fraudulent misrepresentations and omissions in forms Marconi filed with the SEC and the dissemination of the statements published in the British press in the United States." *Id.* at 577. The *Marconi* Court determined such acts to be insubstantial in comparison to the conduct which occurred in the United Kingdom and decided that it "could not have played a significant role in furtherance of any fraud perpetrated against the foreign investors." *Id.* at 578. ("Simply making fraudulent statements about what is happening in the United States does not make those statements 'United States conduct' for purposes of the conduct test.") The court also observed that the defendants did not use the United States as a base of operations for perpetrating fraud, nor was it a case "involving defendants who have unleashed from this country a pervasive scheme to defraud the foreign plaintiffs." *Id.* at 578 (quoting *SEC v. Kasser,* 548 F.2d 109, 114 (3d Cir.1977)) (internal quotations omitted).

*Marconi* is factually distinguishable from the case at bar. In the instant case, the United States conduct involved more than alleged misrepresentations on SEC filings. As detailed above, the representatives of the Companies gave numerous presentations to analysts and investors and issued press releases and other allegedly misleading information in the U.S. to the financial and business community. Defendants argue that this information was only pertinent to United States investors; however, this characterization of Plaintiff's arguments is oversimplified. *See* RDS Br. in Support of Motion to Dismiss for Lack of SMJ, at 17–20. Just as foreign stock exchange data and information is pertinent to United States inves-

tors, the reverse is also true. Moreover, the alleged fraudulent activity which occurred in the United States was in no way confined to the United States market, which, because of the SEC's stringent guidelines and regulations, has become an example for foreign investors and exchanges. The Companies' alleged fraudulent conduct which took place in the United States would, therefore, affect foreign as well as domestic investors.

In support of this motion, Defendants also rely on the declaration of Bart van der Steenstraten. Mr. Steenstraten states that Shell communicates market-sensitive information to financial markets at the same time throughout the world and that the focal point of all communications activity, including the preparation of communications and their dissemination, is in The Hague and London. Steenstraten Decl., ¶ 10, Attached to RDS Br. in Support of Motion to Dismiss for Lack of SMJ.

**Alleged Inconsistent Statements Proffered by Lead Plaintiff**

Defendants allege that Plaintiff, in its Memorandum of Law in further support of the Pennsylvania State Employees' Retirement System ("SERS") and the Pennsylvania Public School Employees' Retirement System ("PSERS") motion for appointment as Lead Plaintiff, stated that "subject matter jurisdiction in a transnational securities case will exist only when the defendants' acts in the United States ... are significant and material" to the alleged fraud. *See* RDS Br. in Support of Motion to Dismiss for Lack of SMJ, at 14. Defendants submit that Plaintiff's brief went on to state that the most significant material conduct occurred outside the U.S. *Id.; see also* RDS Br. in Support of Motion to Dismiss for Lack of SMJ, at 22. In response to this argument, Plaintiff posits that Defendants misrepresent Lead

Plaintiff's position in the Lead Plaintiff application process and disregard the significant investigative effort Lead Plaintiff has undertaken and the discovery it has received since that time. *See* Lead Pl. Br. in Opp'n to RDS Motion to Dismiss for Lack of SMJ, at 26. For the reasons which follow, this Court does not agree with Defendants' representation of Plaintiff's statements.

The following is an excerpt of the SERS and PSERS brief in support of the application for Lead Plaintiff:

> To establish subject matter jurisdiction, therefore, KBC AM must satisfy the requirements of the conduct test. Numerous cases in the Third Circuit have recognized that subject matter jurisdiction in a transnational securities case will exist only when the defendants' acts in the United States are not merely preparatory to fraudulent acts committed abroad, but instead are significant and material.
>
> . . .
>
> The issue presently before the Court is not, however, whether defendants' subject matter jurisdiction defense would succeed against KBC AM. Rather, it is whether that defense can be asserted and, if so asserted, whether it will be a material distraction.
>
> It is clear from the foregoing that Plaintiff has proffered sufficient information to sustain its burden.
>
> . . .
>
> The facts and circumstances set forth in the constituent complaints and found in the news media confirm the difficulties the Court will encounter in addressing the inevitable challenge to the Court's exercise of subject matter jurisdiction over KBC AM's claims. None of the corporate defendants are incorporated in the United States, and all of the individual defendants (with the exception of S.L. Miller) resided abroad during the Class Period. Because Royal Dutch has its principal executive offices in The Hague, and Shell has its principal executive offices in London, all major decision making occurred not in the United States, but in Europe. KBC AM's lead plaintiff papers point to no significant or material acts occurring in the United States. Indeed, the oil reserves at issue are off the coast of Australia and in Nigeria.

Application for Lead Plaintiff Br., at 24, Attached to Millkey Decl., at 24.

The aforesaid statements cannot be interpreted, as Defendants suggest, to stand for the proposition that Lead Plaintiff endorsed the position that the most significant and material conduct occurred outside the U.S. Rather, Lead Plaintiff argued what it knew to be true at the time, that KBC AM's papers pointed to no "significant or material acts occurring in the United States." *See* Application for Lead Plaintiff Br., at 24. This Court will not penalize Lead Plaintiff for arguments made more than one year ago—at the very early stages of this litigation and before any discovery was received. As is clearly detailed above, Lead Plaintiff has conducted extensive research and has proffered sufficient facts and information which meet the requirements of the conduct test: that significant and material acts (applicable to all investors) relating to the alleged fraud did, in fact, occur in the United States.

### *Res Judicata* and the Enforceability of a Judgment by this Court

■ Defendants also conclude that the lack of enforceability of any judgment rendered by this Court over securities purchased abroad by foreign nationals makes the exercise of subject matter jurisdiction futile and improper. *See* RDS Br. in Support of Motion to Dismiss for Lack of SMJ, at 32–39. To sustain this argument, Defendants have retained eight "expert ju-

rists or legal scholars," one for each European country in which the Companies' securities trade, who have "raised serious concerns about whether their courts would recognize or enforce an 'opt out' class action judgment in this case with respect to claims by foreign nationals who purchased shares on foreign exchanges."[7] *Id.* at 33. Each expert was asked to opine on (1) whether a court in their country would enforce a U.S. class action judgment in favor of Plaintiffs, and (2) whether that court would enforce a U.S. judgment in favor of Defendants.

Judge Friendly wrote the following in *Bersch v. Drexel Firestone Inc.*, 519 F.2d 974, 996 (2d Cir.1975):

> [W]hile an American court need not abstain from entering judgment simply because of a possibility that a foreign court may not recognize or enforce it, the case stands differently when this is a near certainty. This point must be considered not simply in the halcyon context of a large recovery which plaintiff visualizes but in those of a judgment for the defendants or a plaintiff's judgment or a settlement deemed to be inadequate.

Defendants' experts opine that any judgment could *probably not* be used by RDS to forestall new lawsuits against it in foreign jurisdictions. (emphasis added). Defendants' experts do not conclude that there is a "near certainty" that foreign courts will not enforce a U.S. judgment. Rather, in Defendants' brief summarizing their experts' opinions, Defendants state that the concerns raised are "not merely hypothetical," but are "very real." *See*

RDS Br. in Support of Motion to Dismiss for Lack of SMJ, at 33.

Lead Plaintiff has also submitted expert declarations. Not surprisingly, Lead Plaintiff's experts opine that there is no consensus about whether the European courts in question would recognize a judgment rendered by this Court. Plaintiff proffers that "although [the experts] generally believe that the courts about which they write are more likely to enforce a judgment in favor of a Foreign Class Member than a judgment in favor of Defendants, all of them identify credible arguments in favor of enforcement on behalf of both class members and Defendants. None of them believes there is a near certainty that the courts in question would refuse to enforce a judgment of this Court in this case, regardless of the outcome." *See* Lead Pl. Br. in Opp'n to RDS Motion to Dismiss for Lack of SMJ, at 31.

Defendants' *res judicata* arguments are unpersuasive. The probability alleged by Defendants of foreign courts failing to enforce a judgment of this Court is not a near certainty. In addition to submitting the declarations, the experts have submitted "supplemental" declarations in response to the declarations submitted by Plaintiff's experts. It is clear to the Court that those declarations were submitted in an effort to convince this Court of the certainty that a judgment will not be enforced; however, the arguments raised by both Defendants and Plaintiff are speculative. Furthermore, this Court will not engage in a "what if" analysis to determine the enforceability, or lack thereof, of any judgment which may be rendered.[8]

---

7. The following is a list of the experts retained by Defendants: Professor Hubert Alexander Groen (The Netherlands), Professor Wolfgang Grunsky (Germany), Professor Gabrielle Kaufmann–Kohler (Switzerland), Georg E. Kodek (Austria), Jacques Lemontey (France), Georges Ravrani (Luxembourg), The Right Honourable Sir Christopher Staughton F.C.I.Arb (United Kingdom), and Hans Van Houtte (Belgium).

8. As an aside, the Court notes Lead Plaintiff's argument that any judgment rendered by this Court in Plaintiff's favor will be enforced in the United States and not in Europe.

**International Comity**

Defendants also assert that considerations of international comity warrant the dismissal of the claims by foreign nationals who purchased shares on foreign exchanges. *See* RDS Br. in Support of Motion to Dismiss for Lack of SMJ, at 37–40. Defendants, relying on the Supreme Court's decision in *F. Hoffmann–La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 124 S.Ct. 2359, 159 L.Ed.2d 226 (2004), argue that the governments of The Netherlands and the United Kingdom have "made conscious choices concerning the appropriate mix of private and public action in the face of allegations of fraudulent securities transactions, [and] have actively pursued remedies pursuant to those choices in the precise context of plaintiffs' claims." *See* RDS Br. in Support of Motion to Dismiss for Lack of SMJ, at 38–39. Defendants admit that while the remedies of both nations are "procedurally and substantively more limited than those available under United States securities laws," the remedies still deserve this Court's respect. *Id.* at 39–40. Otherwise, Defendants contend that this case would pose a "serious risk of interference with a foreign nation's ability independently to regulate its own commercial affairs." *Id.* at 40.

*Hoffmann–La Roche* is legally and factually distinguishable from the case at bar. There, the Supreme Court analyzed, *inter alia,* the ability of a foreign purchaser to bring a Sherman Act antitrust claim based on a foreign harm. As the District Court for the District of Maryland stated in a recent opinion, although "the securities laws are silent as to extraterritoriality, in the antitrust arena Congress has explicitly stated when the Sherman Act reaches foreign activity." *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F.Supp.2d 334, 356 n. 10 (D.Md.2004). The *Royal Ahold* court determined that the merit of the legal arguments raised by the parties in that case, "should be scrutinized according to the standards developed for securities claims, not those based on wholly distinct antitrust laws." *Id.* (citing *Europe and Overseas Commodity Traders, S.A. v. Banque Paribas London,* 147 F.3d 118, 123 (2d Cir.1998)). This Court agrees with the aforesaid analysis and conclusion of the *Royal Ahold* court.

Lead Plaintiff bears the burden of establishing that subject matter jurisdiction exists. *McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178, 182, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); *Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1409 (3d Cir.), *cert. denied,* 501 U.S. 1222, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991). As stated at the outset of this analysis, however, Plaintiff's burden is light; dismissal for lack of jurisdiction is only appropriate where the right claimed "is so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as to not involve a federal controversy." *Dugan v. Coastal Indus., Inc.,* 96 F.Supp.2d 481, 483 (E.D.Pa.2000) (citing *Growth Horizons, Inc. v. Delaware County,* 983 F.2d 1277, 1280–81 (3d Cir.1995)). Lead Plaintiff has adequately pled that Defendants have engaged in material and substantial fraudulent conduct in the United States. Furthermore, in response to the present motion, Lead Plaintiff has supplied adequate financial support for that position. Accordingly, this Court has a sufficient interest in the claims of the foreign investors; therefore, it will invoke its jurisdiction and deny Defendants' Rule 12(b)(1) motion.

## II. Defendant Watts' Rule 12(b)(2) Motion to Dismiss

### A. Standard of Law Applied to Motion to Dismiss Pursuant to Fed.R.Civ.P. 12(b)(2)

Where a defendant challenges a court's exercise of personal jurisdiction, the bur-

den is on the plaintiff to make a *prima facie* showing of jurisdiction. *See Mellon Bank (East) PSFS Nat. Ass'n v. Farino,* 960 F.2d 1217, 1223 (3d Cir.1992); *Time Share Vacation v. Atlantic Resorts, Ltd.,* 735 F.2d 61, 63 (3d Cir.1984). To meet this burden, the plaintiff must establish "with reasonable particularity, sufficient contacts between the defendant and the forum state." *Id.* (citing *Provident Nat'l Bank v. California Fed. Sav. and Loan Assoc.,* 819 F.2d 434 (3d Cir.1987)). When deciding whether to dismiss a case for lack of personal jurisdiction, the Court must accept as true the allegations in the complaint and resolve disputed issues of fact in favor of the plaintiff. *See Carteret Savs. Bank v. Shushan,* 954 F.2d 141, 142 n. 1 (3d Cir.1992) *cert. denied,* 506 U.S. 817, 113 S.Ct. 61, 121 L.Ed.2d 29 (1992). When considering the personal jurisdiction arguments of the foreign individual defendants, "the question becomes whether the party has sufficient contacts with the United States, not any particular state." *In re Royal Ahold N.V. Sec. & ERISA Litig.,* 351 F.Supp.2d 334, 350 (D.Md.2004)(quoting *United Liberty Life Ins. Co. v. Ryan,* 985 F.2d 1320, 1330 (6th Cir.1993)).

What constitutes minimum contacts varies with the "quality and nature of the defendant's activity." *Burke v. Quartey,* 969 F.Supp. 921, 924 (D.N.J.1997) (quoting *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)). The plaintiff may demonstrate that the court has general jurisdiction by showing that the defendant has continuous and systematic contacts with the forum or specific jurisdiction by showing that the cause of action arose out of defendant's activities within or directed towards the forum. *See Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414–16, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). Whether asserting that the court has general or specific jurisdiction, the plaintiff must establish that the defendant's contacts with the

forum are such that the defendant could "reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 292, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).

*General Jurisdiction*

■ An exercise of general jurisdiction is consistent with due process only when the plaintiff has satisfied the burden of establishing that the defendant's contacts are continuous and substantial. *See Giangola v. Walt Disney World Co.,* 753 F.Supp. 148, 154 (D.N.J.1990); *see also Exton v. Our Farm, Inc.,* 943 F.Supp. 432, 437 (D.N.J.1996). Such continuous and substantial contacts with the forum will allow a court to exercise jurisdiction over the defendant even where the underlying cause of action is not specifically related to defendant's contacts. *See Int'l Shoe Co. v. State of Wash., etc.,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

*Specific Jurisdiction*

■ For a court to properly exercise specific personal jurisdiction, the litigation must arise out of in-forum activities or activities directed toward the forum, and "it is essential . . . that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum [State], thus invoking the benefits and protection of its laws." *See Covenant Bank for Savings v. Cohen,* 806 F.Supp. 52, 56 (D.N.J.1992)(quoting *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)).

A court must also consider whether exercising jurisdiction over the defendant would violate traditional notions of "fair play and substantial justice." *Int'l Shoe Co. v. State of Wash., etc.,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). A court may not exercise jurisdiction in such a way as to make litigation "so gravely difficult and inconvenient that a party is at a severe disadvantage to his opponent."

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).

Defendant Watts moves to dismiss the Plaintiff's claims for lack of personal jurisdiction. As Defendant Watts lives and works outside the United States, there is no claim for general jurisdiction. Rather, the issue is whether this Court has specific jurisdiction over this Defendant.

**B. This Court Can Exercise Specific Personal Jurisdiction over Defendant Watts**

Defendant Watts, relying on the fiduciary shield doctrine, asserts that this Court lacks personal jurisdiction because all of the allegations against him pertain to actions taken in his corporate capacity. *See* Def. Watts Br. in Support of Motion to Dismiss, at 9. Where a claim is asserted against an officer of a foreign corporation, some courts will exercise personal jurisdiction over the officer for acts committed in a corporate capacity. The case which Defendant Watts relies upon to support his position is *United Prod. Corp. v. Admiral Tool & Mfg. Co.*, 122 F.Supp.2d 560 (E.D.Pa.2000). The specific issue in *Admiral Tool* was breach of a commercial contract. In fact, the "fiduciary shield doctrine has most often been applied in cases involving corporate disputes, such as breach of contract claims." *Giusto v. Ashland Chemical Co.*, 994 F.Supp. 587, 591 n. 2 (E.D.Pa.1998). The *Giusto* Court noted that although the doctrine had also been applied in cases involving torts, in light of *Calder v. Jones*[9], the reach of the doctrine is questionable. In *Calder*, the Supreme

Court considered an argument that was based on a principle similar to the fiduciary shield doctrine. The Court determined that while defendants' contacts with the forum "are not to be judged according to their employer's activities there, ... their status as employees does not somehow insulate them from jurisdiction. Each defendant's contacts with the forum State must be assessed individually." *Calder*, at 790, 104 S.Ct. 1482.

■ The Fourth Circuit has clearly established that the "fiduciary shield rule is solely a matter of statutory construction under state law and is not required under the due process clause." *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F.Supp.2d 334, 351 (D.Md.2004) (citing *Western Contracting Corp. v. Bechtel Corp.*, 885 F.2d 1196, 1200 (4th Cir.1989)). "While a forum cannot establish personal jurisdiction over foreign defendants based solely on their status as officers in a corporation that is alleged to have committed fraud in the United States, if the complaint sufficiently alleges that the defendants had a direct personal involvement in a tort committed in the forum state, then personal jurisdiction over the defendants does not conflict with the fundamental notions of fairness required by the due process clause." *Royal Ahold*, at 351 (quoting *Columbia Briargate Co. v. First Nat. Bank in Dallas*, 713 F.2d 1052, 1064–65 (4th Cir.1983)) (internal quotations omitted). Because it is consistent with the Supreme Court's analysis in *Calder*, this Court finds the reasoning of the Fourth Circuit persuasive and will apply it in the instant case.[10]

---

**9.** 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984).

**10.** Moreover, even if the fiduciary shield doctrine were to apply in the instant case, the exceptions to this doctrine, (1) the commission of tortious acts in a corporate capacity, and (2) the violation of a statutory scheme

that provides for personal, as well as corporate liability, are applicable. Lead Plaintiff has sufficiently alleged that Watts committed a tortious act—securities fraud—and that his multiple contacts with the United States were related to such fraud. Furthermore, Watts is charged with violating Sections 10(b) and

■ As is described in full detail above, Lead Plaintiff has alleged that Watts signed many SEC filings that contained the materially false and misleading information about proved reserves. "United States courts frequently have asserted personal jurisdiction over individual defendants who sign or, as control persons, approve the filing or disseminating of, particular forms required by the SEC which they knew or should have known would be relied on by U.S. investors." *Royal Ahold*, at 352 (citing *In re CINAR Corp. Sec. Litig.*, 186 F.Supp.2d 279, 305–06 (E.D.N.Y.2002); *Itoba Ltd. v. LEP Group PLC*, 930 F.Supp. 36, 41 (D.Conn.1996); *Derensis v. Coopers & Lybrand*, 930 F.Supp. 1003, 1014 (D.N.J.1996); *Landry v. Price Waterhouse*, 715 F.Supp. 98, 101 (S.D.N.Y.1989)). Moreover, it has been offered that Defendant Watts was in attendance and made presentations at several U.S. conferences, and through these meetings assisted in the dissemination of the material misrepresentations. It is evident that the required nexus between this Defendant's contacts and the Plaintiffs' injuries exists, because the claims are directly related to the United States activity. Defendant Watts, therefore, must have been aware that the information proffered about the proved reserves could have affected the United States market and investors, as well as those abroad. The issue, then, is whether Defendant Watts' contacts were sufficient so that he "should reasonably anticipate being haled into court" in this country. *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 287, 100 S.Ct. 559, 62 L.Ed.2d 490 (1990). This Court concludes that Lead Plaintiff has made a *prima facie* showing that Defendant Watts had minimum contacts with the United States.[11] Finally, as Defendant Watts submits no arguments which convince the Court that asserting jurisdiction over him would violate notions of fair play and substantial justice, this Court concludes that jurisdiction over this foreign defendant is reasonable. For the foregoing reasons, this Court determines that it has personal jurisdiction over Defendant Watts.

### III. The RDS Defendants' Rule 12(b)(6) Motions to Dismiss

In its moving brief, RDS attacks the Complaint on four grounds. First, RDS claims that as "foreign private issuers," it is exempt from Section 14(a) of the Securities Exchange Act of 1934. Therefore, it contends that Counts IV and V of the Complaint should be dismissed for failure to state a claim upon which relief can be granted.

Second, the RDS Defendants argue that Plaintiff's claims under Section 10(b) of the Exchange Act are deficient as a matter of law, as Plaintiff cannot show reasonable reliance on alleged misrepresentations in purchasing the Companies' securities after January 9, 2004. Furthermore, Defendants assert that Plaintiff cannot claim any loss with respect to securities purchased and subsequently sold before the January 9, 2004 announcement.

Third, the RDS Defendants contend that the Complaint does not satisfy the requirements of Fed.R.Civ.P. 9(b) or the PSLRA, 15 U.S.C. § 78u–4(b), as it does not plead

---

20(a) of the Exchange Act, which both include personal liability for corporate actions.

**11.** Even when analyzed under the heightened standard applied by the Second Circuit in Exchange Act cases, this Court reaches the same conclusion. *See In re CINAR Corp. Sec. Litig.*, 186 F.Supp.2d 279, 305 (E.D.N.Y.2002) (citing *Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326, 1340–41 (2d Cir. 1972))("the person sought to be charged must know, or have good reason to know, that his conduct will have effects in the state seeking to assert jurisdiction over him.").

particularized facts concerning each Individual Defendants' participation in and knowledge of the alleged misstatements. Accordingly, Defendants seek the dismissal of the claims brought pursuant to Section 10(b) and 20(a) of the Exchange Act against each Individual Defendant.

Fourth, the Company Defendants argue that Lead Plaintiff has not satisfied the PSLRA's requirements for pleading the scienter of any individual whose knowledge may be attributed to Royal Dutch or Shell Transport, and therefore it has not adequately alleged a violation of Section 10(b).

## A. Standard of Law

Federal Rule of Civil Procedure 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law. *Neitzke v. Williams,* 490 U.S. 319, 326, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989) (citing *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). When considering a 12(b)(6) motion, the Court must accept as true all allegations in the Complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the Plaintiff. *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir.1997). "The inquiry is not whether plaintiffs will ultimately prevail in a trial on the merits, but whether they should be afforded an opportunity to offer evidence in support of their claims." *In re Rockefeller Center Prop., Inc.,* 311 F.3d 198, 215 (3d Cir.2002). The motion to dismiss will be granted only when it is beyond doubt that Plaintiff can prove no set of facts in support of his claims that would entitle him to relief. *Nami v. Fauver,* 82 F.3d 63, 65 (3d Cir. 1996) (citing *Conley,* 355 U.S. at 45, 78 S.Ct. 99). Finally, in considering a motion to dismiss a securities fraud complaint, "the Court is entitled to rely on public documents quoted by, relied upon, incorpo-

rated by reference or otherwise integral to the complaint, and such reliance does not convert such a motion into one for summary judgment." *In re Royal Ahold N.V. Sec. & ERISA Litig.,* 351 F.Supp.2d 334, 349 (D.Md.2004)(quoting *In re USEC Sec. Litig.,* 190 F.Supp.2d 808, 813 (D.Md. 2002)).

Independent of the standard applicable to Rule 12(b)(6) motions, securities fraud claims are subject to the heightened pleading requirements of Fed.R.Civ.P. 9(b) and the PSLRA, 15 U.S.C. § 78u–4(b)(1)(B), (b)(2). Rule 9(b) states: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b); *see also In re Rockefeller,* at 216. "Although Rule 9(b) falls short of requiring every material detail of the fraud such as date, location, and time, plaintiffs must use 'alternative means of injecting precision and some measure of substantiation into their allegations of fraud'." *In re Rockefeller,* at 216. (quoting *In re Nice Sys., Ltd. Sec. Litig.,* 135 F.Supp.2d 551, 577 (D.N.J. 2001)). Additionally, with respect to state of mind, Rule 9(b) states that "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed.R.Civ.P. 9(b); *see also In re Rockefeller,* at 216, n. 15. The Third Circuit has recognized that the imposition of a heightened pleading requirement in fraud actions serves important objectives including (1) providing defendants notice of the claims against them, (2) providing an increased measure of protection for defendants' reputation, and (3) reducing the number of frivolous suits brought solely to extract settlements. *In re Rockefeller,* at 216 (citing *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1418 (3d Cir. 1997)).

While the Third Circuit has acknowledged the "stringency of Rule 9(b)'s plead-

ing requirements," it has also stated that, "in applying Rule 9(b), courts should be sensitive to situations in which sophisticated defrauders may successfully conceal the details of their fraud." *Id.* (internal citations omitted). "Where it can be shown that the requisite factual information is peculiarly within the defendant's knowledge or control, the rigid requirements of Rule 9(b) may be relaxed." *Id.* Regardless, "boilerplate and conclusory allegations will not suffice. Plaintiffs must accompany their legal theory with factual allegations that make their theoretically viable claim plausible." *Id.*

In addition to Rule 9(b), securities fraud allegations must also comply with the heightened pleading requirements of the PSLRA, 15 U.S.C. § 78u–4(b)(1), (b)(2). *In re Rockefeller,* at 217. Section 78u–4(b)(1) requires plaintiffs to:

> specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity the facts on which that belief is formed.

*Id.*

Furthermore, with regard to claims such as those brought under Rule 10b–5, the PSLRA requires that "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity the facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). "The particularity described in § 78u–4(b)(1) extends that of Rule 9(b) and requires plaintiffs to set forth the details of allegedly fraudulent statements or omissions, including who was involved, where the events took place, when the events took place, and why any statements were misleading." *In re Rockefeller,* at 217. (citing S.Rep. No. 104–98, at 15, U.S.Code Cong. & Admin.News 1995, p. 679). To satisfy the pleading requirement of the PSLRA, plaintiffs must state with particularity either "(1) facts which show that defendants had both motive and opportunity to commit fraud; or (2) facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.,* 142 F.Supp.2d 589, 604 (D.N.J.2001) (citing *In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, 534 (3d Cir.1999)). Recklessness involves "not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* In this context, conscious behavior is defined as "intentional fraud or other deliberate illegal behavior." *Id.* The PSLRA requires that "motive and opportunity" allegations. be supported "by facts stated with particularity and must give rise to a strong inference of scienter." *Schoenfeld,* at 605 (quoting *Advanta,* at 535) (internal quotations omitted).

With these heightened pleading requirements in mind, this Court will undertake a detailed analysis of Lead Plaintiff's allegations and Defendants' challenges. to those pleadings.

## B. Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b)

■ Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), prohibits the "use or employ, in connection with the purchase or sale of any security, ... [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe ..." 15 U.S.C. § 78j(b); *see also In re Ikon Office Solu-*

*tions, Inc.,* 277 F.3d 658, 666 (3d Cir.2002). Section 10(b) is enforced through Rule 10b–5 which "makes it unlawful for any person [t]o make any untrue statement of a material fact or to omit to state a material fact necessary to make the statements made in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." *In re Ikon,* at 666 (citing 17 C.F.R. § 240.10b–5(b)).

In order to state a valid claim under Section 10(b) and Rule 10b–5, Lead Plaintiff must demonstrate that Defendants "(1) made a misstatement or an omission of a material fact (2) with scienter (3) in connection with the purchase or the sale of a security (4) upon which the plaintiff reasonably relied and (5) that the plaintiff's reliance was the proximate cause of his or her injury." *In re Ikon,* at 666 (citing *GFL Advantage Fund, Ltd., v. Colkitt,* 272 F.3d 189, 212 (3d Cir.2001); *Weiner v. Quaker Oats Co.,* 129 F.3d 310, 315 (3d Cir.1997)).

**C. Plaintiff's Section 10(b) Claims Against the Royal Dutch/Shell Defendants[12] (Count I)**

*Post–January 9, 2004 Share Purchases*

The Class Period alleged in the Complaint includes purchases of Royal Dutch and Shell Transport securities during the period April 8, 1999 through March 18, 2004. Defendants assert that as a matter of law, any purchases made after the January 9, 2004 announcement, which disclosed the majority of the proved reserves recategorization, could not have been made in reasonable reliance upon any prior alleged misstatements about proved reserves. Defendants also argue that the Complaint does not adequately plead loss causation. *See* RDS Br. in Support of 12(b)(6) Motion to Dismiss, at 16–18.

In *Semerenko v. Cendant Corp.,* 223 F.3d 165, 178 (3d Cir.2000), the Third Circuit analyzed the fraud on the market theory of investor reliance.[13] "Traditionally,

---

**12.** Defendants KPMG NV, Boynton, Watts and van de Vijver join in the RDS motion to dismiss on these grounds. The Court has considered the briefs filed by the aforesaid Defendants and the following analysis applies to them as well as to the RDS Defendants. *See* KPMG NV Br. in Support of Motion to Dismiss, at 2 n. 4; Boynton Br. in Support of Motion to Dismiss Pursuant to 12(b)(6), at 31–34; van de Vijver's Br. in Support of Motion to Dismiss Pursuant to 12(b)(6), at 25–30; Watts Br. in Support of Motion to Dismiss Pursuant to 12(b)(6), at 28–30.

**13.** In *Semerenko,* the Class filed an action against Cendant, its former officers and directors and its accountant alleging that the defendants violated § 10(b) by making certain misrepresentations about Cendant during a tender offer for shares of common stock. In addition to finding that the Class members who purchased shares prior to March 3, 1998 reasonably relied on alleged misrepresentations occurring prior to that date, the *Semerenko* Court also concluded that the Class members who purchased shares of common

stock between March 3, 1998 and April 15, 1998, before the merger at issue was finalized, alleged sufficient facts to satisfy the element of reliance. *Semerenko,* at 179–80. However, the Third Circuit did not conclude that it was reasonable for the Class members to rely on the defendants' prior financial statements and auditors' reports following the April 15, 1998 disclosure of the accounting irregularities. *Id.* at 181. The Complaint in *Semerenko* alleged that Defendant Cendant disclosed on April 15, 1998 that it had uncovered accounting irregularities and that investors were warned not to rely on its prior financial statements and auditor's reports when making investment decisions. *Id.* Allegedly, the market price of each stock instantly dropped after Cendant issued the warning. *Id.* The Third Circuit concluded that the announcement immediately rendered the prior misrepresentations concerning Cendant's financial condition immaterial as a matter of law and therefore, "neither the market nor the Class members could have reasonably relied upon Cendant's prior financial statements or its audit reports after April 15, 1998." *Id.*

purchasers and sellers of securities were required to establish that they were aware of, and directly misled by, an alleged misrepresentation to state a claim for securities fraud under § 10(b) and Rule 10b–5." *Semerenko*, at 178 (citing *Peil v. Speiser*, 806 F.2d 1154, 1160 (3d Cir.1986)). However, the requirement of showing direct reliance "presents an unreasonable evidentiary burden in a securities market where face-to-face transactions are rare and where lawsuits are brought by classes of investors;" therefore, the Third Circuit has adopted a rule, the fraud on the market theory, that "creates a presumption of reliance in certain cases." *Id.* The fraud on the market theory affords a plaintiff in a securities action a "rebuttable presumption of reliance if he or she purchased or sold securities in an efficient market." *Semerenko*, at 178 (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1419 n. 8 (3d Cir.1997)).

■ Under this theory, a plaintiff is entitled to three separate presumptions when attempting to establish the element of direct reliance: "(1) that the market price of the security actually incorporated the alleged misrepresentations, (2) that the plaintiff actually relied on the market price of the security as an indicator of its value, and (3) that the plaintiff acted reasonably in relying on the market price of the security." *Semerenko*, at 178–79 (citing *Zlotnick v. TIE Communications*, 836 F.2d 818, 822 (3d Cir.1988)). A defendant may rebut this presumption by raising any defense to actual reliance, including, *inter alia*, that the market did not respond to the alleged misrepresentations, that the market was aware that the misrepresentations were false, or that the investor would have purchased or sold the securities at that price even with full knowledge of the misrepresentation. *Semerenko*, at 179 (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 248, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988); *Zlotnick*, at 822).

In the case at bar, this Court determines that Lead Plaintiff has sufficiently pled the element of reliance to withstand this 12(b)(6) challenge. The instant case is distinguishable from *Semerenko* in that the January 9, 2004 announcement by the Companies was not entirely curative. As the Lead Plaintiff alleges, the January 9th disclosures, were only "a partial revelation of the truth," and the Companies' securities, therefore, remained artificially inflated. *See* Lead Pl. Br. in Opp'n to 12(b)(6) Motion to Dismiss, at 59; *see also* Compl., ¶¶ 463, 469–72.

■ However, in light of the recent Supreme Court decision *Dura Pharmaceuticals, Inc. v. Broudo*, —— U.S. ——, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005), this Court determines that Lead Plaintiff has failed to adequately plead loss causation with respect to the post-January 9, 2004 share purchases. In *Dura*, the Court held that an inflated purchase price will not by itself constitute or proximately cause the relevant economic loss needed to allege and prove loss causation. *Dura*, at 1631. The Court reasoned that the "logical link between the inflated share purchase price and any later economic loss is not invariably strong," and that with all else being equal, the longer the time between purchase and sale, the more likely it is that other factors caused the loss. *Id.* at 1632. The Court determined:

Given the tangle of factors affecting price, the most logic alone permits us to say is that the higher purchase price will sometimes play a role in bringing about a future loss. It may prove to be a necessary condition of any such loss, and in that sense one might say that the inflated purchase price suggests that the misrepresentation [ ] "touches upon" a later economic loss. But, even if that is so, it is insufficient. To "touch upon," a

loss is not to cause a loss, and it is the latter that the law requires.

*Dura,* at 1632 (citing 15 U.S.C. § 78u–4(b)(4)).

In reaching this decision, the Supreme Court drew upon the common-law roots of the securities fraud action. *Id.* at 1632–33. The Court recognized that judicially implied private securities-fraud actions resemble common-law deceit and misrepresentation actions, which have "long insisted that a plaintiff in such a case show not only that had he known the truth he would not have acted but also that he suffered actual economic loss." *Id.* at 1632. Furthermore, the Court noted that the securities statutes maintain public confidence in the marketplace by "deterring fraud, in part, through the availability of private securities actions." However, "the statutes make these latter actions available, not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Id.* at 1633.

This led the Supreme Court to conclude that the plaintiffs' complaint in *Dura* failed to adequately allege the requirements of proximate causation and economic loss. *Dura,* at 1634. The Court noted that the Federal Rules of Civil Procedure require only "a short and plain statement of the claim showing that the pleader is entitled to relief," and that the securities statutes do not impose any special further requirement with respect to the pleading of proximate causation or economic loss. *Dura,* at 1634 (quoting Fed.R.Civ.P. 8(a)(2)). The complaint in *Dura* contained only one statement that could be read as describing the loss caused by the defendants' misrepresentations: that the plaintiffs paid artificially inflated prices for Dura's securities and suffered damages. *Dura,* at 1634. The Supreme Court determined that the complaint's "failure to claim that Dura's

share price fell significantly after the truth became known suggests that the plaintiffs considered the allegation of purchase price inflation alone sufficient." *Id.* The Court concluded that allowing a plaintiff "to forgo giving any indication of the economic loss and proximate cause that the plaintiff has in mind would bring about harm of the very sort the statutes seek to avoid. It would permit a plaintiff with a largely groundless claim to simply take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value, rather than a reasonably founded hope that the [discovery] process will reveal relevant evidence. Such a rule would tend to transform a private securities action into a partial downside insurance policy." *Dura,* at 1634 (quoting *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 741, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975)) (internal quotations omitted).

When the Complaint in the case at bar is analyzed in light of the *Dura* decision, it is evident that Lead Plaintiff has not adequately alleged proximate causation and economic loss with respect to the post-January 9th purchases. The Complaint cites the January 9th announcement's impact on the market and also details the subsequent drop in the stock prices of Royal Dutch and Shell securities; however, the same is not pled with respect to the March 18, 2004 announcement. As *Dura* instructs, Lead Plaintiff cannot simply rely on the artificially inflated prices of the RDS securities to support the claims which stem from the securities purchased after January 9, 2004. Therefore, such claims cannot survive.

*Shares Purchased and Sold Within the Putative Class Period*

The RDS Defendants also assert that the Complaint claims losses based upon shares that putative Class Members pur-

chased and held throughout the Class Period, and also upon shares both purchased and sold during the Class Period. *See* RDS Br. in Support of 12(b)(6) Motion to Dismiss, at 19. Defendants submit that the claims based on Section 10(b) must be dismissed because Plaintiff has suffered no legally cognizable economic loss in connection with shares purchased and sold during the Class Period. Lead Plaintiff asserts that the Complaint clearly demonstrates a legally cognizable economic loss based on the first-in-first-out ("FIFO") methodology of damage calculation. *See* Lead Pl. Br. in Opp'n to 12(b)(6) Motion to Dismiss, at 63. Whether this method is sound and whether it will be adopted by this Court is not a matter for discussion at this procedural phase. "The determination of damages, like the determination of liability, is a complicated and uncertain process, typically involving conflicting expert opinions." *Maley v. Del Global Tech. Corp.*, 186 F.Supp.2d 358, 365 (S.D.N.Y.2002). The motions presently before this Court are motions to dismiss and this Court does not accept Defendants' invitation to quantify damages at this stage of the litigation.

*Shares of Purchasers Who Have Purchased During the Class Period and Have Not Yet Sold*

Defendants also argue that the claims of those purchasers that have not yet sold the securities cannot survive this motion to dismiss. In light of the *Dura* decision, this Court agrees. Such purchasers are invoking the exact insurance policy that *Dura* warned against and any such losses are speculative, at best. Those who purchased during the Class Period but have yet to sell their securities have not alleged proximate causation and economic loss; therefore those purchasers may not join the putative class.

### D. Plaintiff's 10(b) Claims Against the Individual Defendants (Count I)

*Misstatements or Omissions*

Under Rule 10b–5(b), "plaintiffs must first establish that the defendants made a materially false or misleading statement, or that the defendants omitted to state a fact such that other statements of fact actually made were rendered materially misleading." *In re DVI, Inc. Sec. Litig.*, 2005 WL 1307959, *6 (E.D.Pa. May 31, 2005)(quoting *Marra v. Tel–Save Holdings, Inc.*, 1999 WL 317103, *4 (E.D.Pa. May 18, 1999)). Defendants claim that Lead Plaintiff has failed to allege that any of the Individual Defendants made or participated in the creation of a single misleading statement. Rather, Defendants argue that Lead Plaintiff invokes the "group pleading" doctrine to support the allegations in the Complaint. *See* RDS Br. in Support of 12(b)(6) Motion to Dismiss, at 24; Boynton Br. at 15; Watts Br. at 19; *see also* Compl., ¶ 74 ("the Individual Defendants are liable for the false statements pleaded herein, as those statements were each 'group published' information, the result of the collective action of the Individual Defendants"). Accordingly, Defendants seek the dismissal of the Section 10(b) claims against each Individual Defendant.

Under the group pleading doctrine,

the identification of the individual sources of statements is unnecessary when the fraud allegations arise from misstatements or omissions in group-published documents, such as Annual Reports, prospectuses, registration statements, press releases, or other 'group published information' that presumably constitute the collective actions of those individuals involved in the day-to-day affairs of the corporation.

*In re American Bus. Fin. Serv., Inc. Sec. Litig.*, 2005 WL 1324880 (E.D.Pa. June 2, 2005)(quoting *Winer Family Trust v. Queen*, 2004 WL 2203709, at *6 (E.D.Pa. Sept.27, 2004)).

Although the Third Circuit has not ruled on whether the group pleading doctrine has survived the enactment of the PSLRA, the district courts in this Circuit favor the conclusion that it has not. *See In re American Bus. Fin. Serv., Inc. Sec. Litig.*, at *13; *see also Winer Family Trust v. Queen*, 2004 WL 2203709, at *6; *But see In re U.S. Interactive, Inc. Class Action Sec. Litig.*, 2002 WL 1971252, *5 (E.D.Pa. Aug.23, 2002)(holding that the group pleading doctrine is valid when applied to officers where it is almost certain that given the high-level position of the officer within the company and the nature of the published writing that he would have been involved directly with writing the document or approving its content and that the officer was privy to information concerning the accuracy of the statements within the document). Lead Plaintiff claims that it does not rely on the group pleading doctrine, but rather, "identifies with particularity the who, what, where, and why required by Rule 9(b) and the PSLRA." *See* Lead Pl. Br. in Opp'n to 12(b)(6) Motion to Dismiss, at 16. Alternatively, Lead Plaintiff asks this Court to apply the group pleading doctrine.

"Courts holding that the [group pleading] doctrine does not survive have reasoned that to permit a judicial presumption as to particularity simply cannot be reconciled with the statutory mandate that plaintiffs must plead specific facts as to each act or omission by the defendant." *In re DVI, Inc. Sec. Litig.*, 2005 WL 1307959, *6 (E.D.Pa. May 31, 2005)(quoting *Marra v. Tel–Save Holdings, Inc.*, 1999 WL 317103 (E.D.Pa. May 18, 1999)) (internal quotations omitted). After reviewing the case law in this Circuit and the underlying policy rationale of the PSLRA

and the group pleading doctrine, this Court concludes that Lead Plaintiff cannot rely on the group pleading doctrine to support a Rule 10b–5 claim. Therefore, Lead Plaintiff must attribute at least one statement to each of the Individual Defendants to whom a violation of Rule 10(b) is alleged.

 Defendants assert that Lead Plaintiff does not attribute a single alleged misstatement to Individual Defendants Jacobs, Brinded, Miller, Roels, Skinner or van den Bergh. *See* RDS Br. in Support of 12(b)(6) Motion to Dismiss, at 25. Defendants acknowledge that the Complaint alleges that the aforementioned Individual Defendants "reviewed and authorized" assorted Company filings; however, in Defendants' estimation, Lead Plaintiff has not alleged facts which suggest any individual was involved in preparing the corporate proved reserves disclosures that are alleged to be materially misleading. *Id.* at 25–26.

Lead Plaintiff alerts this Court to the fact that Defendants Watts, van de Vijver, van der Veer, van den Bergh and Moody–Stuart all signed various annual and SEC reports on Form 20–F and Form 6–K during the Class Period, each of which are alleged to have contained materially false and misleading misstatements. *See* Lead Pl. Br. in Opp'n to 12(b)(6) Motion to Dismiss, at 16; *see also* Compl., ¶¶ 48, 49, 51 & 55. Moreover, Defendants Watts, van der Veer and Boynton signed Sarbanes–Oxley certifications that are alleged to have been materially false and misleading. *See* Lead Pl. Br. in Opp'n to 12(b)(6) Motion to Dismiss, at 16; *see also* Compl., ¶¶ 48, 51, 52, 454, 455, 456 & 457.

The Third Circuit has not addressed the issue of whether signatories to financial statements can be held to have adopted that document as a statement. In *In re Reliance Sec. Litig.*, 135 F.Supp.2d 480,

503 (D.Del.2001), the court applied the Ninth Circuit's reasoning in *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061 (9th Cir.2000), and concluded that an officer who signs an SEC filing makes a statement under Section .10(b), even if that officer did not participate in the drafting of the document. "Key corporate officers should not be allowed to make important false financial statements knowingly or recklessly, yet still shield themselves from liability to investors simply by failing to be involved in the preparation of those statements." *In re Reliance*, at 503 (quoting *Howard*, at 1062). At this stage of the litigation, this Court will permit Lead Plaintiff's claims against Defendants Watts, van de Vijver, van der Veer, van den Bergh, Moody–Stuart and Boynton to proceed, assuming the other elements of the securities fraud claim are sufficiently pled.

■■■ With respect to Defendants Skinner and Brinded, Lead Plaintiff alleges that they "made or participated in misstatements about reserves during conference calls and interviews." *See* Lead Pl. Br. in Opp'n to 12(b)(6) Motion to Dismiss, at 17; *see also* Compl., ¶¶ 302, 353, 420, 425, 427.[14] The Complaint alleges that Defendants Skinner and Brinded were present at meetings or conferences, however, it does not allege that either Defendant actually made a statement or omission. "While the Third Circuit has not yet held whether a person can be a primary violator of Section 10(b) on the basis of substantial participation in the creation of a company's statements, most courts have adopted a 'bright line' test for primary participation, that is in order to be liable, a person must actually make the material misstatement or omission, which must be attributed to him or her when disseminated." *In re DVI, Inc. Sec. Litig.*, 2005 WL 1307959, *8 (E.D.Pa. May 31, 2005)(citing *Wright v. Ernst & Young LLP*, 152 F.3d 169, 174 (2d Cir.1998); *Shapiro v. Cantor*, 123 F.3d 717, 720 (2d Cir.1997); *Sec. Exch. Comm'n v. Lucent Tech., Inc.*, 2005 WL 771228, at *12 (D.N.J. April 6, 2005)).[15] Because this Court finds that it is consistent with the heightened pleading requirements of the PSLRA, this Court adopts the bright line standard for attributing statements to the Individual Defendants. Accordingly, the 10(b) allegations that Defendants Skinner and Brinded participated in meetings and conferences in which material misrepresentations were made are insufficient to survive the instant motion to dismiss.

Lead Plaintiff has also not attributed any statements or omissions to Defendants Miller, Roels or Jacobs. Plaintiff argues that even where a Defendant did not make a false or misleading statement which would subject him to liability pursuant to Rule 10b–5(a) and (c), he may still be held liable as a "secondary actor" if he committed primary violations of the securities laws through manipulative or deceptive acts. *See* 17 C.F.R. §§ 240.10b–5. To state a claim for a primary violation under Rule

---

14. Lead Plaintiff also alleges that Defendants Watts, van de Vijver, Moody–Stuart, van der Veer and Boynton are liable under Rule 10(b) under this same theory, however, because this Court already determined that Lead Plaintiff may proceed with the 10(b) claims against said Defendants, it will not analyze their liability under this theory.

15. One of the reasons that some Courts favor the bright line test is the Supreme Court's holding in *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). There, the Supreme Court held that there is no private right of action for aiding and abetting a violation of 10(b), and that 10(b) "prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act." *Central Bank*, at 177, 114 S.Ct. 1439.

10b–5(a) or (c), a plaintiff must allege that defendant "(1) committed a manipulative or deceptive act (2) in furtherance of the alleged scheme to defraud, (3) scienter, and (4) reliance." *In re Global Crossing, Ltd. Sec. Litig.*, 322 F.Supp.2d 319, 336 (S.D.N.Y.2004). Plaintiff claims that each Individual Defendant engaged in manipulative or deceptive conduct regardless of whether that Individual Defendant made a materially false or misleading statement. *See* Lead Pl. Br. in Opp'n to 12(b)(6) Motion to Dismiss, at 27. When this theory of liability is applied to the claims asserted against Defendants Miller, Roels and Jacobs, said claims cannot survive the instant motion to dismiss.

Lead Plaintiff alleges that Defendant Miller served on the CMD board in June 1998, when "that body considered and approved the [Value Creation Team's] recommendation to relax the Group's reserves reporting guidelines to allow bookings of reserves as proved with only reasonable expectations of an available market." *See* Lead Pl. Br. in Opp'n to 12(b)(6) Motion to Dismiss, at 28. Lead Plaintiff contends that the decision to adopt the recommendations was integral to the "scheme to inflate reported proved reserves." *Id.* Furthermore, Plaintiff alleges that Defendant Miller attended high level meetings in 2000 and 2001 with senior officers and directors of SEPCo and the Companies in Houston at which the Nigerian overbookings were discussed. *Id.*

Defendant Roels' alleged participation is that he reviewed and considered a Note for Information that warned of overstated proved reserves and that he participated in meetings and discussed the overstatement of the proved reserves. *See* Lead Pl. Br. in Opp'n to 12(b)(6) Motion to Dismiss, at 29. Finally, Lead Plaintiff alleges that as the Chairman of the GAC from 2002 forward, Defendant Jacobs was an active participant in the scheme to overbook proved

reserves and conceal the truth from investors. *Id.* at 29–30.

This Court concludes that Plaintiff has not stated with sufficient specificity fraudulent acts engaged in by Defendants Miller, Roels and Jacobs which tie them to the alleged scheme or fraud. Although said Defendants are alleged to have been present at various meetings and are alleged to have seen Notes of Information, the pleadings do not specifically allege the actual involvement of Defendants Miller, Roels and Jacobs. Furthermore, for the reasons stated above, Plaintiff is also unable to sustain a 10(a) or a 10(c) claim against Defendants Skinner or Brinded.

*The Statements Were Fraudulent or Misleading*

██ Lead Plaintiff alleges that the Companies issued materially false public reports that overstated their proved oil and natural gas reserves, their reserves replacement ratio and their standard measure of future discounted cash flows. Compl., ¶¶ 3–4. There can be no question that Lead Plaintiff has identified Defendants' allegedly false and misleading statements with particularity. "In addition to requiring plaintiffs to specify each statement alleged to have been misleading, however, the PSLRA directs plaintiffs to specify the reason or reasons why the statement is misleading." *CA Public Employees' Retirement Sys. v. Chubb*, 394 F.3d 126, 145 (3d Cir.2004); *see also* 15 U.S.C. § 78u–4(b)(1). With respect to the "true facts" recited in the Complaint, the PSLRA requires Plaintiff to "state with particularity all facts on which that belief is formed." *Chubb*, at 145–46. In the instant case, much like *Chubb*, Plaintiff relies on internal memoranda and confidential personal sources to meet this pleading burden. When assessing the sufficiency of allegations made on information and belief pursuant to 15 U.S.C. § 78u–4(b)(1), the Third Circuit has adopted the

Second Circuit's interpretation of that section of the PSLRA. Pursuant to that view, "plaintiffs need only plead with particularity sufficient facts to support" the beliefs, and need not plead with particularity "every single fact upon which their beliefs concerning false or misleading statements are based." *Chubb*, at 146 (quoting *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir.2000)). Furthermore, *Truncellito v. Scholastic Corp. (In re Scholastic Corp. Sec. Litigation)* "instructs that a plaintiff relying on internal reports must specify the internal reports, who prepared them and when, how firm the numbers were or which company officers reviewed them." *Chubb*, at 147 (quoting *Truncellito*, 252 F.3d 63, 72–73 (2d Cir.2001))(internal quotations omitted).

Unlike the pleadings in *Chubb*, in the case at bar, Lead Plaintiff pleads with particularity sufficient facts to support the beliefs alleged in the Complaint and has set forth the statements it alleges to be misleading. *See* Compl., ¶¶ 300–462. Lead Plaintiff identifies when and in what capacity the confidential sources were employed by the Companies and how the former employees gained access to the information pled. *See* Compl., ¶¶ 79–86; *see also Chubb*, at 148. The citations to internal memoranda are replete with facts which identify the author(s) and recipient(s) of the memoranda and the date and context of each document. *See* Compl., ¶¶ 158–184. Accordingly, this Court determines that Plaintiff's allegations are sufficiently particularized.

*Scienter of the Individual Defendants*

■ "Scienter is a mental state embracing intent to deceive, manipulate or defraud." *In re Reliance Sec. Litig.*, 135 F.Supp.2d 480, 506 (D.Del.2001)(quoting *Dirks v. SEC*, 463 U.S. 646, 103 S.Ct. 3255,

77 L.Ed.2d 911 (1983)) (internal quotations omitted). The Third Circuit has stated that although the PSLRA established a uniform pleading standard, it did not alter the substantive law of scienter. *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534 (3d Cir.1999). To that end, the Third Circuit has held that "it remains sufficient for plaintiffs [to] plead scienter by alleging facts establishing a motive and an opportunity to commit fraud, or by setting forth facts that constitute circumstantial evidence of either reckless or conscious behavior." *Id.*, at 534–35 (quoting *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 318 n. 8 (3d Cir.1997)). "Motive and opportunity, like all other allegations of scienter (intentional, conscious, or reckless behavior), must now be supported by facts stated with particularity and must give rise to a strong inference of scienter." *In re Advanta*, at 535 (citing 15 U.S.C. § 78u–4(b)(2)).[16] The Third Circuit has defined a reckless statement as one "involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or so obvious that the actor must have been aware of it." *In re Advanta*, at 535 (quoting *McLean v. Alexander*, 599 F.2d 1190, 1197 (3d Cir.1979)).

■ The Complaint alleges that Defendants knowingly or recklessly overstated the Companies' proved reserves and managed those reserves to conceal the truth from the investing public. Lead Plaintiff's allegations that the Individual Defendants knowingly or recklessly inflated proved reserves and concealed the truth with respect thereto by managing reserves during the Class Period fall into three categories: presentation materials, Notes to the CMD

---

**16.** Lead Plaintiff has not plead scienter by alleging facts establishing a motive and an opportunity to commit fraud; therefore, this Court will not analyze the claims under this theory.

and internal memoranda, and e-mails and correspondence. *See* Lead Pl. Br. in Opp'n to 12(b)(6) Motion to Dismiss, at 17.

*Presentation Materials*

The Complaint cites numerous documents and/or warnings in which the Companies' reported proved reserves were signaled to be non-compliant with SEC rules. *See* Compl., ¶¶ 149–156, 181 (summaries of the allegations are included in the Facts section above). One allegation makes reference to a 2003 presentation which focused, *inter alia*, on Oman and Nigeria and which was prepared for a meeting of the Conference. Compl., ¶ 181. A draft of this presentation, which stated "the total volume not in compliance with SEC guidelines in the proved reserves filing in the 20–F as per 31/12/02 has become significant" was distributed to some members of the Shell Group's senior staff. *Id.*

*Notes and Memos*

The Notes and memoranda detailed in the Complaint pertain to information which was prepared for review by the CMD and other senior executives within the Companies. *See* Compl., ¶¶ 157, 158, 160, 163, 167, 170, 171, 174, 176, 177 and 184. Among the allegations are warnings of overstated reserves from GRA Barendregt to senior Shell Group executives in the EP unit and to KPMG and PwC. Compl., ¶ 157. Additionally, the Complaint cites the GAC Report as revealing that senior executives "repeatedly generated and circulated reports among other senior Shell Group executives warning that the Companies' internal guidelines for booking reserves were inconsistent with current SEC guidelines." Compl., ¶ 158. The content of a Note for Information summarizing the Companies' reserves position, which was forwarded to the CMD on February 11, 2002 by van de Vijver, is recounted in the Complaint. In that Note, van de Vijver estimated the amount of proved reserve exposures due to the non-compliance with SEC guidelines. *Id.*

A second presentation to the CMD in a Note for Discussion was submitted by van de Vijver on July 22, 2002. That Note observed that without the identified aggressively booked reserves in Gorgon and Nigeria, "total proved RRR over the past 10 years would be reduced from 102% to 88%." Compl., ¶ 163. Furthermore, in a confidential personal Note to File, van de Vijver acknowledged that "[a]ggressive/premature reserves bookings provided impression of higher growth rate than realistically possible." Compl., ¶ 167. On November 15, 2002, Defendant van de Vijver circulated a brief outline of business plan issues to members of his EP staff stating, *inter alia*, that the finalized plan submission would not have been submitted if they "could have been honest about past failures," including reserves manipulation. Compl., ¶ 170.

*E–Mails and Correspondence*

The Complaint identifies numerous e-mails and other communications discussing the aggressive or premature bookings which were exchanged between Defendants Watts and van de Vijver. For example, as detailed more fully above, on September 2, 2002, van de Vijver submitted a note to the CMD and copied Defendant Boynton. The September 2nd Note described the effects of the "aggressive booking in 1997–2000." *Id.* ¶ 166. Moreover, on November 9, 2003 van de Vijver sent an e-mail to Watts stating that he was "becoming sick and tired about lying about the extent of our reserves issues and the downward revisions that need to be done because of far too aggressive/optimistic bookings." Compl., ¶ 178.

The Complaint also contains allegations which highlight Defendants' "play for time" strategy. Lead Plaintiff cites documents, which in its estimation, demonstrate that Defendants devised and imple-

mented the "play for time" strategy to conceal the premature booking of reserves in the hope conditions would "justify, or mitigate, the existing reserves exposures." *See* Lead Pl. Br. in Opp'n to 12(b)(6) Motion to Dismiss, at 43. Lead Plaintiff points to documents such as those created for the CMD in July and September 2002 and the personal Note to File written by van de Vijver in which he acknowledged that "[p]roviding credible explanations for these issues proved near impossible given the disconnects between external promises/expectations and the reality of the state of the business." *See* Compl., ¶¶ 163 & 166–167.

Defendants argue that while the communications create some inference of the Individual Defendants' knowledge, the allegations do not rise to the level necessary to prove scienter. *See* RDS Br. in Support of 12(b)(6) Motion to Dismiss, at 35.

In addition to the arguments set forth in Defendant RDS' brief in support of this motion to dismiss, Defendants van de Vijver, Boynton and Watts have also submitted briefs on this issue. Defendants van de Vijver and Boynton assert that Plaintiff cannot satisfy its pleading obligations by relying on the Individual Defendants' positions with the Companies or their access to corporate information. *See* van de Vijver Br. in Support of 12(b)(6) Motion to Dismiss, at 17–20; *see also* Boynton Br. in Support of 12(b)(6) Motion to Dismiss, at 27–28. This Court is cognizant that a complaint must plead specific allegations and is satisfied that the instant Complaint clears this hurdle. The Complaint makes reference to information received by Defendant Boynton which spotlights the alleged fraud and the Defendants' efforts to conceal the truth about the reserves.

In defense of the myriad documents which are cited in the Complaint which focus on van de Vijver's alleged knowledge, van de Vijver argues that the allegations simply "raise the inference that van de Vijver tenaciously tried to untangle the complicated reserves issues that he inherited when he became EP CEO, get the CMD to focus on the reserve issues, and press then-CMD chairman (and his predecessor) Watts to act honestly and conservatively on a going-forward basis when developing reserves projections." *Id.* at 20. Furthermore, van de Vijver asserts that the communications cited in the Complaint do not support a strong inference that the proved reserves were *materially* non-compliant with SEC Rule 4–10. *Id.* at 20. (emphasis in original).

This Court finds Defendant van de Vijver's arguments to be unpersuasive. Van de Vijver's proffered reasons for issuing the communications documented in the Complaint do not detract from the strong circumstantial evidence of recklessness alleged in the Complaint. *See In re Burlington Coat Factory,* 114 F.3d 1410, 1418 (3d Cir.1997). Furthermore, the alleged justifications for van de Vivjer's reckless conduct are not subjects to be analyzed by this Court at this stage of the litigation.

Similarly, Defendant Watts contends that he "was not orchestrating any fraud, but rather was merely part of an open and reasonable discussion of how to comply with unclear and changing regulatory pronouncements." *See* Watts Br. in Support of 12(b)(6) Motion to Dismiss, at 20. As with Defendant van de Vijver, Watts' argument does not detract from the strong circumstantial evidence of recklessness alleged in the Complaint. For the foregoing reasons, this Court concludes that Plaintiff's Rule 10b–5(b) claims may proceed against Individual Defendants Watts, van de Vivjer, van der Veer and Boynton.[17]

**17.** Defendant Boynton is only charged with violations of the Exchange Act for statements

However, because the allegations of misstatements, scheme liability, and/or scienter do not meet the heightened standards of Fed.R.Civ.P. 9(b) and the PSLRA with respect to the 10(b) claims against the Individual Defendants Moody–Stuart, van den Bergh, Jacobs, Brinded, Miller, Skinner and Roels, said claims are dismissed.

### E. Plaintiff's Claims based on Violations of Section 14(a) of the Exchange Act (Counts IV and V)

In Counts IV and V of the Complaint, Lead Plaintiff alleges that Defendants violated Section 14(a) of the Exchange Act and Rule 14a–9 governing the solicitation of proxies by disseminating Notices of Meeting containing false and misleading statements. Compl., ¶¶ 542, 575. Section 14(a) states the following:

> It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 781 of this title.

15 U.S.C. § 78n(a).

■ Defendants contend that the SEC rules explicitly provide that, "foreign private issuers like Royal Dutch and Shell Transport 'shall be exempt' from section 14(a)." See RDS Br. in Support of 12(b)(6) Motion to Dismiss, at 14. Defendants cite SEC rule 17 C.F.R. § 240.3a12–3(b), which states, "[s]ecurities registered by a foreign private issuer, as defined in Rule 3b–4

shall be exempt from sections 14(a), 14(b), 14(c), 14(f) and 16 of the Act." 17 C.F.R. 240.3a12–3(b)(2004).

Plaintiff claims that when Defendants issued false proxy materials they waived any right to the exemption. Plaintiff relies on *Wilson v. Great Am. Indus., Inc.,* which stated, "even though the proxy was not legally required in this case, when defendants choose to issue a proxy plaintiffs have a right to a truthful one." *Wilson,* 979 F.2d 924, 931 (2nd Cir.1992). However, in *Wilson,* there was no applicable exemption; the defendant company was not a foreign private issuer. *Id.* at 926. Courts have held that foreign private issuers are not subject to claims under Section 14(a) for alleged misstatements in proxy statements. *See Batchelder v. Kawamoto,* 147 F.3d 915 (9th Cir.1998). Plaintiff has offered no case law to suggest that the exemption to 14(a) does not apply in this situation. Rather, Plaintiff offers various policy rationales for overturning the SEC rule. After careful consideration, this Court declines that invitation and also determines that the exemption to Rule 14(a) does apply in the case at bar. Therefore, Plaintiff's Section 14(a) claims against Royal Dutch and Shell Transport fail, as a matter of law. Accordingly, Royal Dutch and Shell Transport's motion to dismiss Counts IV and V of the Complaint is granted.

### F. Plaintiff's Claims based on Violations of Section 20(a) of the Exchange Act (Count III)

■ Section 20(a) imposes joint and several liability on any person who "controls a person liable under any provision of the [Exchange Act]." *In re Alpharma Inc. Sec. Litig.,* 372 F.3d 137, 153 (3d Cir.2004)

---

and conduct that occurred after June of 2001, when she began her employment with the Companies. *See* Lead Pl. Br. in Opp'n to

12(b)(6) Motion to Dismiss, at 23, n. 17; *see also* Boynton Reply, at 2.

(quoting *Shapiro v. UJB Financial Corp.*, 964 F.2d 272, 279 (3d Cir.1992)) (internal quotations omitted). Under the plain language of the statute, "plaintiffs must prove not only that one person controlled another person, but also that the controlled person is liable under the Act. If no controlled person is liable, there can be no controlling person liability." *Id.* The heightened pleading requirements of Rule 9(b) do not apply to claims under Section 20(a). *In re U.S. Interactive, Inc. Class Action Sec. Litig.*, 2002 WL 1971252, *18 (E.D.Pa. Aug.23, 2002). "Allegations that support a reasonable inference that [defendants] had the potential to influence and direct the activities of the primary violator suffice to plead control person liability." *Id.*

■ Lead Plaintiff has adequately pled underlying securities law violations; therefore, the first requirement of a Section 20(a) violation is met. Moreover, the Complaint has proffered sufficient facts which demonstrate the direct involvement of the Individual Defendants Watts, van de Vijver, van der Veer and Boynton in daily operations and their power to influence and control the decision making of the Companies, including the content and dissemination of statements, reports and filings which allegedly are false and misleading. In their respective briefs, Defendants Watts, Boynton and van de Vijver also argue that Lead Plaintiff has failed to adequately plead facts which allege that each was a controlling person. *See* van de Vijver Br., at 34–36; Boynton Br., at 34–39; and Watts Br., at 38–40. The factual disputes raised by Watts, Boynton and van de Vivjer do not defeat Lead Plaintiff's allegations, because the ultimate determination of whether the Individual Defendants were controlling persons involves questions of fact to be resolved by the factfinder. *P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*, 142 F.Supp.2d 589, 624 (D.N.J.2001) (citing *In re Cendant Corp. Litig.*, 60 F.Supp.2d 354, 379–80 (D.N.J.1999)). Therefore, Individual Defendants Watts, van de Vivjer, van der Veer and Boynton's motion to dismiss Count III is denied. Additionally, because this Court concludes that Plaintiff's 10(b) claims against Individual Defendants Moody–Stuart, van den Bergh, Jacobs, Brinded, Miller, Skinner and Roels fail as a matter of law, the related Section 20(a) claims against these Defendants also fail.

## IV. *The Auditor Defendants' Rule 12(b)(6) Motions to Dismiss*

### A. Statute of Limitations

■ KPMG NV argues that the five-year statute of limitations has run as to any claim based on KPMG NV's audit of the Group's year-end 1998 through 2000 financial statements. KPMG NV Br., at 36. Claims brought under Section 10(b) or Rule 10b–5 must be filed "within one year after the discovery of the fact constituting the violation and within three years after such violation." *Rocker Mgmt., L.L.C, et al. v. Lernout & Hauspie Speech Prods., NV.*, 2005 WL 1365772, *3 (D.N.J. June 8, 2005)(quoting *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 364, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991)). Under the objective inquiry notice standard, the limitations period begins to run when a plaintiff "discovered or in the exercise of reasonable diligence should have discovered the basis for [the] claim against the defendant." *Rocker*, at *3 (quoting *Del Sontro v. Cendant Corp.*, 223 F.Supp.2d 563, 571 (D.N.J.2002)).

Lead Plaintiff argues that under Federal Rule of Civil Procedure 15(c), the filing of the Complaint in September 2004, "relates back" to the filing of the first complaint in January 2004, making Plaintiff's claims based upon the 1998 Form 20–F against the Auditor Defendants timely. Plaintiff asserts that it did not discover

evidence of the Auditors' role in the scheme until July 15, 2004, when The Wall Street Journal published a relevant article. *See* Lead Pl. Br. in Opp'n to KPMG NV and PwC UK 12(b)(6) Motion to Dismiss, at 56. Lead Plaintiff submits that it added the Auditor Defendants to this litigation at the earliest opportunity after this discovery. *Id.* For the reasons submitted in Lead Plaintiff's Brief in Opposition to Defendant KPMG NV and PwC UK's motion to dismiss, this Court determines that the relation back doctrine applies in the instant case and all claims against the Auditor Defendants are therefore timely.

## B. KPMG NV's and PwC UK's Motions to Dismiss Count II of the Complaint

Lead Plaintiff alleges that in its "role as the Companies' external accountants, KPMG NV and PwC UK undertook responsibility for auditing and reviewing the Companies' financial statements before they were publicly disseminated in accordance with Generally Accepted Auditing Standards [ ]." *See* Lead Pl. Br. in Opp'n to KPMG NV and PwC UK 12(b)(6) Motion to Dismiss, at 2. Furthermore, Plaintiff contends that KPMG NV and PwC UK "abrogated their responsibilities by providing materially false audit certifications in which they represented, among other things, that the financial statements were presented fairly, in all material respects, in accordance with Generally Accepted Accounting Principals [ ], and that they conducted their audits in accordance with GAAS." *Id.* Essentially, the Complaint alleges that: KPMG NV and PwC UK issued "clean" audit opinions which ultimately proved to be erroneous, there were steps that the Auditors might have taken but failed to, and there were numerous "red flags" that the Auditors ignored or failed to investigate.

"In securities fraud claims against an auditor—claims which generally are based on the fraud of others—the failure ... to identify problems with the defendant-company's internal controls and accounting practices does not constitute reckless conduct sufficient for § 10(b) liability." *In re Suprema Specialities, Inc. Sec. Litig.*, 334 F.Supp.2d 637, 657 (D.N.J. 2004) (quoting *Nappier v. Pricewaterhouse Coopers LLP*, 227 F.Supp.2d 263, 273 (D.N.J.2002)). What is required is for plaintiff to allege that the auditor's conduct was "highly unreasonable, representing an extreme departure from the standards of ordinary care [and] must, in fact, approximate an actual intent to aid in the fraud being perpetrated by the audited company." *In re Suprema Specialities*, at 657 (citing *Rothman v. Gregor*, 220 F.3d 81, 98 (2d Cir.2000)). Furthermore, "allegations of GAAP violations or accounting irregularities standing alone, are insufficient to state a securities fraud claim....[O]nly where such allegations are coupled with evidence of corresponding fraudulent intent, might they suffice." *In re Suprema Specialities*, at 657 (quoting *Nappier*, at 276). Additionally, "allegations that an auditor must have known, by virtue of its role as auditor, of the defendant company's role [are] insufficient by themselves to permit an inference of recklessness." *Id.*

Lead Plaintiff argues that within the audit reports submitted by KPMG NV and PwC UK were the false and misleading statements. Specifically, Plaintiff points to two statements that the auditors made in each annual opinion: (1) that the auditors "conducted their audits in accordance with GAAS"; and (2) that the financial statements "presented fairly, in all material respects, the financial position of the Group." *See* Lead Pl. Br. in Opp'n to KPMG NV and PwC UK 12(b)(6) Motion to Dismiss, at 10. KPMG NV and PwC UK contend that the audit opinions ex-

pressed no view as to the core of Plaintiff's claims—the propriety of the Companies' internal controls and the Group's Supplementary Information. *See* KPMG NV Br. at 10–13; PwC UK Br. at 11–13.

Lead Plaintiff maintains that it did not charge the Auditors with Rule 10b–5(b) liability because of statements about internal controls or Supplementary Information, but rather the Group's internal control weaknesses and overstated supplementary information form the predicate reasons for the falsity of the Auditors' challenged statements. *See* Lead Pl. Br. in Opp'n to KPMG NV and PwC UK 12(b)(6) Motion to Dismiss, at 12. The Auditor Defendants assert, however, that Plaintiff's argument that these non-audited aspects of Companies somehow caused the audit opinions to be false is attenuated.

In its reply brief, KPMG NV points out that the restatement of the financial statements does not necessarily mean that a false audit opinion was issued. *See* KPMG NV Reply Br. at 10–13; PwC UK Br. at 4. Defendant asserts that Plaintiff's argument ignores the possibility that the Companies restated the reserves despite there being no material misstatement in the financial statements. The Auditor Defendants maintain that the Companies "restated the unaudited Supplementary Information and so chose to restate the financial statements simultaneously even though the financial effect was not material and would not therefore have independently required any financial restatement." *See* KPMG NV Reply Br. at 10–13; PwC UK Br. at 4 (citing *Shell Transport and Trading Co. PLC Audit & Reserves Reports Conference Call and Presentation—Final, Fair Disclosure Wire,* Apr. 19, 2004, at 5). Furthermore, Defendants note that the financial statements were restated by only .4% of net income for 2001 and 1.1% for 2002,

amounts which are relatively small in relation to those in the cases cited in Plaintiff's opposition brief. A restatement of the Companies' financial statements occurred and although limited, the restatement aids Plaintiff's attempt to infer knowledge based on the massive reach of the alleged fraud. The Auditor Defendants also attack Plaintiff's contention that they falsely represented compliance with GAAS. As is described in great detail in the Complaint, Lead Plaintiff claims that the Auditors had knowledge of the improper reserves bookings and that under GAAS, the Auditors should have qualified the audit opinions with a note about the Supplementary Information. The Statement of Auditing Standards ("SAS") No. 52 requires an auditor to: (1) ask management about the methods of preparing the supplementary information, including whether it is measured and presented in accordance with prescribed guidelines; (2) inquire as to "management's understanding of the specific requirements for disclosure of the supplementary oil and gas reserves information"; (3) compare the company's recent production with reserves estimates for properties having significant production or reserves quantities and inquire about disproportionate ratios; (4) compare the company's reserves information with the company's financial statements; and (5) make additional inquiries of management if the auditor believes that the company's supplementary information concerning proved reserves may not be presented in accordance with GAAP. After applying these procedures, if the auditor has unresolved substantial doubt about the required supplemental information and its adherence to the prescribed guidelines, the auditor should identify this limitation in its audit opinion in accordance with the procedures prescribed by the professional standards. AU § 558.06;

Attached to Decl. of Jeffrey M. Haber in Support of Lead Pl. Opp'n to KPMG NV and PwC UK 12(b)(6) Motion to Dismiss, Ex. 5; *see also* Compl., ¶ 521.

The Auditor Defendants argue that Plaintiff has not alleged facts which indicate that PwC UK or KPMG NV had such substantial or unresolved doubts. However, the examples cited in the Complaint lead this Court to a different conclusion. The Complaint details a presentation which Group managers made on January 31, 2000 in which it was reported, *inter alia*, that a substantial portion of the Shell Petroleum Development Company of Nigeria, Ltd.'s reported proved reserves were vulnerable and non-compliant with SEC rules. Compl., ¶ 149. The same presentation also highlighted the fact that proved reserves could not be booked in Gorgon because of "limited market availability and already large uncommitted proved gas reserves." *Id.* Furthermore, the presentation noted that reported proved reserves in Gorgon had been a point of contention for the previous two years with external auditors. *Id.*

The Supreme Court has observed that "[f]ar from a single-source accounting rulebook, GAAP encompasses the conventions, rules, and procedures that define accepted accounting practice at a particular point in time." *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 101, 115 S.Ct. 1232, 131 L.Ed.2d 106 (1995). "The determination that a particular accounting principle is generally accepted may be difficult because no single source exists for all principles." *Id.* Relying on this, the *In re Global Crossing, Ltd. Sec. Litig.* Court determined that whether the Companies' practice of accounting was ever acceptable under the applicable provisions of GAAP

cannot be determined in advance of the development of the record. 322 F.Supp.2d 319, 339 (S.D.N.Y.2004). The Court noted that "eventual evidence on industry practice or expert testimony are likely to shed light on this question," however, at that procedural phase, plaintiffs' assertion that the Companies' practices were not generally accepted must be taken as true. *Id.*

This Court finds that the same principle applies in the case at bar. Lead Plaintiff alleges facts that would permit a reasonable factfinder to infer that the methods of accounting employed by KPMG NV and PwC UK in certifying Royal Dutch and Shell Transport's financial statements were deficient. Therefore, this Court is satisfied that Lead Plaintiff has alleged false statements and more than mere conclusory allegations that KPMG NV and PwC UK had unresolved substantial doubt as to the content of their reports and their compliance with GAAS.[18]

■■■ Defendants next argue that Plaintiff has failed to plead facts sufficient to support a strong inference of scienter, as required by the PSLRA. "In the Third Circuit, a plaintiff may establish the requisite inference of fraudulent intent by alleging either: 1) facts establishing a motive and an opportunity to commit fraud; or 2) facts that constitute circumstantial evidence of either recklessness or conscious behavior." *Nappier v. Pricewaterhouse Coopers LLP*, 227 F.Supp.2d 263, 275 (D.N.J.2002)(citing *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534–35 (3d Cir. 1999)). With respect to motive, Plaintiff only asserts conclusory allegations that KPMG NV and PwC UK each had an interest in ignoring the Companies' alleged fraud in order to maintain its auditing

---

**18.** Lead Plaintiff also claims that KPMG NV and PwC UK are liable under Rule 10b–5(a) and (c) for scheme liability, however, because the Court finds Plaintiff's allegations support-

ing its 10(b) claim to be sufficient, this Court will not analyze the claims under the theory of scheme liability.

relationship and in order to "expand the enormous fees they were receiving from their non-auditing services." *See* Lead Pl. Br. in Opp'n to KPMG NV and PwC UK 12(b)(6) Motion to Dismiss, at 43. This Court does not find such allegations to constitute evidence of scienter and therefore will turn to Lead Plaintiff's proffered direct and circumstantial evidence of conscious misconduct or recklessness. *See In re First Merchants Acceptance Corp. Sec. Litig.*, 1998 WL 781118 (N.D.Ill. Nov.4, 1998)(generation of business motive was rejected because court recognized that accounting firm's "greatest asset is its reputation for honesty, followed closely by its reputation for careful work.")

Examples of direct evidence of KPMG NV's and PwC UK's conscious misbehavior or recklessness are highlighted both in the Complaint and in Lead Plaintiff's opposition brief. The Complaint alleges that the Auditors were aware, no later than January 1998, that the RDS Defendants were engaged in the improper booking of reserves as proved. *See* Lead Pl. Br. in Opp'n to KPMG NV and PwC UK 12(b)(6) Motion to Dismiss, at 29; *see also* Compl., ¶ 149. As evidence of this, Lead Plaintiff cites the January 2000 internal presentation in which it was noted that "reported proved reserves in Gorgon had been a point of contention for the previous two years with [the] external auditors." *See* Lead Pl. Br. in Opp'n to KPMG NV and PwC UK 12(b)(6) Motion to Dismiss, at 29. PwC UK argues that "far from demonstrating complicity in fraud, the Notice simply demonstrates that the 'external auditors' were asking questions." *See* PwC Reply Br., at 9. Additionally, KPMG NV contends that this presentation "does not approximate the type of 'smoking gun' plaintiffs need to raise a strong inference of scienter." *See* KPMG NV Reply Br., at 14. (quoting *Nappier,* at 278 (so-called red-flags, which should be deemed to have put defendant on notice of alleged improprie-

ties, must be closer to smoking guns than mere warning signs)).

Lead Plaintiff submits that the Auditors were not merely "asking questions", but rather, took steps that were inconsistent with their obligations. Plaintiff alleges that during the January 2000 Presentation, "[g]roup managers made a presentation that showed [a RRR] of 37% for the year ended December 31, 1999," however, the Companies "robustly rejected" this recommendation and instead announced a significantly higher RRR of 56%. *See* Lead Pl. Br. in Opp'n to KPMG NV and PwC UK 12(b)(6) Motion to Dismiss, at 30. Lead Plaintiff proffers that Defendant Watts stated that the judgment to reject the recommendation of the Group managers and use the higher RRR was "reviewed by Shell's external auditors." *Id.*

As further proof of scienter, Plaintiff observes that KPMG NV and PwC UK received actual notice of booking improprieties from the GRA, in the form of two memoranda. *See* Lead Pl. Br. in Opp'n to KPMG NV and PwC UK 12(b)(6) Motion to Dismiss, at 31. In January 2002, GRA Barendregt prepared a memorandum which warned that a portion of the 2001 mature reserves was at risk of being overstated. *Id.* It is alleged that KPMG NV and PwC UK received this memorandum, as well as a similar one which was prepared the following year. In January 2003, Barendregt warned that the Group's guidelines for booking reserves did not comply with SEC guidelines in all instances, and raised questions about the integrity of the Companies' overall reserves reporting system. *Id.* at 32. Lead Plaintiff alleges that "in addition to apprising the Companies' external auditors of specific overbooked reserves, Barendregt also expressed his concern to the Auditors that the Companies' 'scorecard' system of compensation, which linked proved reserves

additions to business and individual score-cards, was contributing to the overbooking of reserves." *Id.* at 33. Furthermore, Plaintiff alleges that in his January 2003 warning, Barendregt wrote that "senior managers in the EP division rejected doing away with reserves-related bonuses, and that it is the auditor's firmly held belief that the reserves-addition targets in these score cards present a potential threat to the integrity of the Group's reserves estimates." *Id.* KPMG NV and PwC contend that the reports only refer to a small slice of the Companies' reserves which were at risk of being overstated and that this would not have caused the Auditors to question the financial statements themselves. KPMG Reply Br., at 15; PwC Reply Br. at 10–12. Furthermore, KPMG argues that such reports are not "the kind of smoking gun" needed to show scienter. *Id.*

The Complaint also makes reference to circumstantial evidence which Plaintiff submits as proof that KPMG NV and PwC UK acted with scienter. The circumstantial evidence includes the magnitude of the fraud, the Auditors' extensive role in reviewing the Companies' proved reserves and internal reserves guidelines, and the Auditors' alleged violations of GAAS. *See* Lead Pl. Br. in Opp'n to KPMG NV and PwC UK 12(b)(6) Motion to Dismiss, at 35–43. It is well recognized that "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim … only where such allegations are coupled with evidence of corresponding fraudulent intent, might they suffice." *Nappier,* 227 F.Supp.2d at 276. However, as is detailed above, Plaintiff has alleged sufficient evidence of corresponding fraudulent intent on the part of KPMG NV and PwC UK. As the Third Circuit explained in *McLean v. Alexander,* "the issue is whether the defendants had an honest belief that the statements made by them were true. If

they did have that honest belief, whether reasonably or unreasonably, they are not liable. If they did not have an honest belief in the truth of their statements, then they are liable, so far as (scienter) is concerned." 599 F.2d 1190, 1198 (quoting *O'Connor v. Ludlam,* 92 F.2d 50, 54 (2d Cir.1937)).

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must construe all inferences in favor of the Plaintiff. Additionally, in order to defeat Defendants' motion, Plaintiff is required to plead allegations which support a strong inference of scienter. In the case at bar, Plaintiff meets this burden. The magnitude of the reserves restatement and the Auditor Defendants' alleged knowledge of related information, coupled with the specific GAAS and GAAP violations and the "red flags" support an inference that KPMG NV's and PwC UK's conduct was reckless. Furthermore, the Auditor Defendants' arguments that they were simply "doing their job" by reporting weaknesses in the financial statements of the Companies does not absolve them of liability. For the Auditors to have recognized potential problems yet continue to sign off on financial statements only supports Plaintiff's claim of reckless behavior. *See In re First Merchants Acceptance Corp. Sec. Litig.,* 1998 WL 781118, *11 (N.D.Ill. Nov.4, 1998).

Accordingly, for purposes of a Rule 12(b)(6) motion and its limitations, Plaintiff has alleged specific facts which could establish Section 10(b) liability. Defendant KPMG NV's and PwC UK's motions to dismiss Count II of the Complaint are denied.

## C. KPMG International's and PwC International's Motions to Dismiss (Count II)

Based upon the allegations in the Complaint, PWC International and KPMG

International have done no auditing work and have not signed any financial assessments regarding Royal Dutch and Shell Transport. There are several references in the Complaint to the knowledge and conduct of a collective "PwC" and "KPMG". *See* Compl., ¶¶ 512–533. Plaintiff asks this Court to allow it to proceed based upon the notion that "PwC" and "KPMG" are "unitary, worldwide firms," i.e., that these firms hold themselves out to the world as one firm with accountants in offices world-wide. *See* Lead Pl. Br. in Opp'n to KPMG International and PwC International 12(b)(6) Motion to Dismiss, at 7. The Court does not agree.

Plaintiff argues that KPMG International and PwC International hold themselves out as integrated worldwide firms and tout themselves on their websites as a "global network" or "global firm." *Id.* at 8, 11. However, the Court, upon visiting the respective International Auditor firm websites, reaches a different conclusion. The KPMG International website states,

> KPMG International is a Swiss cooperative that serves as a coordinating entity for a network of independent member firms. KPMG International provides no services to clients. Each member firm is a separate and independent legal entity and each describes itself as such.

*www.kpmg.com.*

The PwC website contains similar language, "PricewaterhouseCoopers refers to a network of member firms of PricewaterhouseCoopers International Limited, each of which is a separate and independent legal entity." *www.pwcglobal.com.* In *In re Lernout & Hauspie Sec.*, the Court noted,

> The Website's express declaration that each member of KPMG International is a "separate and independent legal entity" precludes any reasonable inference of apparent authority, and Plaintiffs make no argument that the "status" of the various KPMG member entities vis a

vis KPMG International should give them inherent agency powers (i.e., implied authority) to bind the entire association for their individual misstatements.

230 F.Supp.2d 152, 173 (D.Mass.2002).

In rejecting one-firm claims against the international body, the District Court of Maryland stated,

> Plaintiff's emphasis on the facts that the two firms shared a brand name and the corporate website described a "global" firm are similarly unavailing. It is well recognized that "[m]ember firms in an international accounting association are not part of a single firm and are neither agents nor partners of other member firms simply by virtue of using the same brand name."

*In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F.Supp.2d 334, 385 (D.Md.2004). Moreover, in *Skidmore v. KPMG*, the Court held, "Plaintiffs' allegations that KPMG was acting as a 'worldwide organization' are 'insufficient as a matter of law to state a claim against KPMG LLP for the acts of the KPMG member firm in Morocco'." 2004 WL 3019097, *4 (N.D.Tex. Dec.28, 2004). Many courts addressing similar claims, "have required plaintiffs to plead substantially more than a bare bones 'unified company theory'." *Id.* (citing *In re Asia Pulp & Paper Sec. Litig.*, 293 F.Supp.2d 391 (S.D.N.Y.2003)).

The District of New Jersey, in the recent decision of *Rocker Mgmt. v. Lernout & Hauspie Speech Prods.*, also rejected the "one firm" theory applied to accounting firms. 2005 WL 1365772 (D.N.J. June 8, 2005). In making this decision, Judge Lifland referred to the KPMG Annual Report, which stated that the KPMG International balance sheet, "represents composite information of the separate member firms of KPMG International and is combined here solely for presentation purposes. KPMG itself is a non-operating associa-

tion." *Id.* *7. The *Rocker* Court held, "[t]he lumping together of KPMG offices under one 'KPMG' reference offends the particularity requirements embodied in Rule 9(b) and the PSLRA and is insufficient to rescue the deficiencies in the allegations concerning misstatements attributable to KPMG US." *Id.* *8.

The Complaint in the case at bar, much like those in the aforesaid cases, alleged no facts which suggest the affiliation of KPMG International or PwC International with the Defendant Companies. Accordingly, Defendants KPMG International's and PwC International's motions to dismiss Count II of the Complaint are granted.[19]

The claims in Count II of the Complaint against PwC International are dismissed with prejudice because the Court foresees no reasonable likelihood that an amended pleading complying with Fed.R.Civ.P. 11 could adequately assert that this Defendant is liable. Hence, such an attempted argument would likely be futile. However, because Plaintiff has summarily alleged possible participation by KPMG International itself in audits of Shell Nigeria reserves and accounts, this Court's dismissal of the Count II claims against KPMG International is without prejudice. *See* Lead Pl. Br. in Opp'n to KPMG International and PwC International 12(b)(6) Motion to Dismiss, at 21–24. If Plaintiff so chooses, it may file a second amended Complaint (or an amendment to the present Complaint) incorporating, *inter alia*, allegations against KPMG International and its alleged involvement in the audits and accounting practices of Shell Nigeria. Federal Rule of Civil Procedure 15(a) provides that "leave to amend shall be freely given when justice so requires." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir.1997). "Among the grounds that could justify a denial of leave to amend are undue delay, bad faith, dilatory motive, prejudice, and futility." *Id.* This Court finds that Plaintiff has not acted in bad faith nor has it acted in an effort to prolong litigation. Furthermore, this Court does not determine that Defendant KPMG International will be unduly prejudiced by an amendment. Finally, this Court cannot make the conclusion, based upon the facts before it, that an amendment as to this Defendant would be futile.

## CONCLUSION

For the foregoing reasons, the motions brought by the RDS Defendants, the Individual Defendants, KPMG NV, KPMG International, PwC UK and PwC International to dismiss the claims that are asserted on behalf of putative class members who are foreign nationals and who purchased their shares on foreign exchanges, pursuant to Federal Rule of Civil Procedure 12(b)(1), are denied. Defendant Watts' motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2) is also denied. The Royal Dutch and Shell Transport Group Defendants' motion to dismiss Counts I and III of the Complaint and Individual Defendants Watts, van de Vijver, van der Veer and Boynton's motions to dismiss Counts I and III of the Complaint, pursuant to Fed.R.Civ.P. 12(b)(6) *et al.*, are denied. Individual Defendants Moody–Stuart, van den Bergh, Jacobs, Brinded, Miller, Skinner and Roels motions to dismiss Count I and Count III of the Complaint are granted, and claims against them are dismissed without prejudice. Defendants Royal Dutch and Shell Transport's motion to

---

19. For the reasons stated herein, Lead Plaintiff's arguments based on vicarious liability also fail.

dismiss Counts IV and V of the Complaint is granted, with prejudice. KPMG NV's and PwC UK's motions to dismiss Count II of the Complaint are denied. PwC International's and KPMG International's motions to dismiss Count II of the Complaint are granted and that Count is dismissed as to PwC International with prejudice and as to KPMG International, without prejudice. The claims of those alleged class members who purchased the securities in question during the Class Period but have not yet sold are dismissed, with prejudice. The claims of those alleged class members who purchased the securities in question after January 9, 2004 and have sold them thereafter are dismissed without prejudice. Lead Plaintiff may, if it so chooses, amend the present Complaint and, in compliance with *Dura Pharmaceuticals, Inc. et al.,* — U.S. ——, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005), plead proximate causation and economic loss with respect to the securities purchased after January 9, 2004 (and sold thereafter) including, but not limited to, a detailed analysis of the impact of the March 18, 2004 announcement. Plaintiff also may, if it so chooses, amend the present Complaint to plead certain claims against KPMG International, and Individual Defendants Moody–Stuart, van den Bergh, Jacobs, Brinded, Miller, Skinner and Roels, consistent with this Opinion. Any such amended pleading permitted above shall be filed and served within 30 days. As to any such claim now dismissed without prejudice which is not so amended, the dismissal shall become one with prejudice.

### ORDER

For the reasons set forth in the Court's Opinion filed herewith,

It is on this 9th day of August, 2005, **ORDERED** that:

(1.) The motions brought by the RDS Defendants, the Individual Defendants, KPMG NV, KPMG International, PwC UK and PwC International to dismiss the claims that are asserted on behalf of putative class members who are foreign nationals and who purchased their shares on foreign exchanges, pursuant to Federal Rule of Civil Procedure 12(b)(1), be and they hereby are denied;

(2.) Defendant Watts' motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2) be and it hereby is denied;

(3.) The Royal Dutch and Shell Transport Group Defendants' motion to dismiss Counts I and III of the Complaint and Individual Defendants Watts, van de Vijver, van der Veer and Boynton's motions to dismiss Counts I and III of the Complaint, pursuant to Fed.R.Civ.P. 12(b)(6) *et al.,* be and they hereby are denied;

(4.) Individual Defendants Moody–Stuart, van den Bergh, Jacobs, Brinded, Miller, Skinner and Roels motions to dismiss Count I and Count III of the Complaint be and they hereby are granted, and claims against them are dismissed without prejudice.;

(5.) Defendants Royal Dutch and Shell Transport's motion to dismiss Counts IV and V of the Complaint is granted, with prejudice;

(6.) KPMG NV's and PwC UK's motions to dismiss Count II of the Complaint be and they hereby are denied;

(7.) PwC International's and KPMG International's motions to dismiss Count II of the Complaint be and they hereby are granted and that Count is dismissed as to PwC International with prejudice and as to KPMG International, without prejudice;

(8.) The claims of those alleged class members who purchased the securities in question during the Class Period but have

not yet sold be and they hereby are dismissed, with prejudice;

(9.) The claims of those alleged class members who purchased the securities in question after January 9, 2004 and have sold them thereafter be and they hereby are dismissed without prejudice; and

(10.) Lead Plaintiff may, if it so chooses, amend the present Complaint and, in compliance with *Dura Pharmaceuticals, Inc. et al.,* —— U.S. ——, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005), plead proximate causation and economic loss with respect to the securities purchased after January 9, 2004 (and sold thereafter) including, but not limited to, a detailed analysis of the impact of the March 18, 2004 announcement;

(11.) Plaintiff also may, if it so chooses, amend the present Complaint to plead certain claims against KPMG International, and Individual Defendants Moody–Stuart, van den Bergh, Jacobs, Brinded, Miller, Skinner and Roels, consistent with this Opinion; and

(12.) Any amended pleading permitted in paragraphs 10 and 11 above shall be filed and served within 30 days of the date of this Order. As to any such claim now dismissed without prejudice which is not so amended, the dismissal shall become one with prejudice.